**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Walter L. NIXON, Jr.,
Defendant–Appellant.**

**No. 89–4127.**

United States Court of Appeals,
Fifth Circuit.

Aug. 17, 1989.

---

Michael B. Holleman, Boyce Holleman, Gulfport, Miss., David Overlock Stewart, Ropes & Gray, Washington, D.C., for defendant-appellant.

James M. Cole, Trial Atty., Public Integrity Section, Crim. Div., U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before JONES, SMITH and DUHE, Circuit Judges.

EDITH H. JONES, Circuit Judge:

## BACKGROUND

Appellant, Judge Walter L. Nixon, Jr. was convicted by a jury on two counts of perjury. His conviction and sentence were affirmed on direct appeal. *United States v. Nixon*, 816 F.2d 1022 (5th Cir.), *reh'g denied*, 827 F.2d 1019 (5th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 749, 98 L.Ed.2d 762 (1988). Appellant then filed this 28 U.S.C. § 2255 petition, requesting a new trial. The habeas court conducted an evidentiary hearing on August 29 and 30, 1988. On December 19, 1988 the court issued a comprehensive and thorough opinion denying Nixon's petition. *Nixon v. United States*, 703 F.Supp. 538 (S.D.Miss. 1988). A detailed factual backdrop for this appeal may be gleaned from the opinions of the habeas court and our prior decision on direct review of the conviction. Hence, we shall not engage in an extensive repetition of the facts or the trial testimony. The district court summarized the events leading to the petitioner's conviction as follows:

> Acting on information supplied by an informant, the government convened a special grand jury for the purpose of determining whether the Petitioner (and others) acted improperly regarding Drew Fairchild's drug case. Petitioner voluntarily appeared before that grand jury. He denied discussing the case with Prosecutor [Bud] Holmes and denied having anything to do with it or trying to influence anyone with respect to it. Subsequently, he was charged with certain violations of the law, including two counts of perjury with respect to these denials.

703 F.Supp. at 572.

Nixon was charged with one count of receiving an illegal gratuity and three perjury counts. The jury acquitted Nixon on the gratuity charge and on one of the perjury counts. His conviction was based on the following grand jury testimony:

*Count III*

Q. Did [Bud Holmes] ever discuss the Drew Fairchild case with you?

A. (Nixon). No, not to the best of my recollection. I think I would recall if he had.

*Count IV*

(Nixon). Now, I have had nothing whatsoever officially or unofficially to do with the Drew Fairchild criminal case in federal court or state court ... I have never handled any part of it, never had a thing to do with it at all and never talked to anyone, state or federal, prosecutor or judge, in any way [to] influence anybody with respect to this case.

One important witness, who testified twice before the grand jury, at Nixon's trial and at the evidentiary hearing, was Wiley Fairchild, a Hattiesburg, Mississippi businessman. Wiley Fairchild had pleaded guilty to giving Nixon an illegal gratuity in return for Nixon's helping Fairchild's son Drew in connection with Drew's drug case. Another witness critical to Nixon's presentation in the § 2255 hearing was John Baltar, who had been an aide to Wiley Fairchild during Fairchild's plea bargaining and the trial of Judge Nixon. The habeas court found neither of these witnesses credible.

On appeal, Nixon's multiple claims for relief have been winnowed down to three. First, Nixon asserts that the government knowingly concealed from him information which could have been used to impeach Wiley Fairchild and in doing so violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Second, Nixon contends that Wiley Fairchild's recantation of some of his trial testimony warranted a new trial. Third, based on facts pertinent to the foregoing arguments, Nixon asserts that the government knowingly presented false testimony at trial. These claims require us to determine whether the district court abused its discretion by not granting Nixon's motion for a new trial.

Wiley Fairchild's role in the prosecution should be briefly recapitulated to clarify the following discussion. Wiley Fairchild testified at Nixon's trial as a government witness, explaining his relationship with the judge that led to the back-dated transfer of oil property interests about the time Drew Fairchild was arrested in a drug conspiracy. Wiley further testified that at some point during Drew's state prosecution, Wiley became convinced that several

of the parties were trying to blackmail him. He bitterly complained to Judge Nixon, whom he knew to be a friend of the local prosecutor Bud Holmes. Thereafter, Wiley said, he received a telephone call one evening from Nixon and Holmes which, although brief, reassured him that Drew's case would be favorably resolved. The substance of this telephone call forms the basis for Nixon's conviction on Counts III and IV. Other witnesses who testified concerning this call included Judge Nixon himself, Bud Holmes, Fairchild's lawyer Carroll Ingram, and Holmes's successor District Attorney Glenn White. The latter two witnesses were both informed about the phone call and testified favorably to the prosecution. Our first opinion in this case affirmed Judge Nixon's conviction based largely on the conflict between his testimony and that of Bud Holmes concerning the telephone call to Wiley Fairchild. 816 F.2d at 1026–28. It is also worthwhile to observe that even though Nixon stakes this habeas petition on the critical importance of Wiley Fairchild's testimony regarding the date of the incriminating telephone call, in other court papers he has averred that the precise date was not significant.

## BRADY MATERIAL

■ *Brady v. Maryland, supra,* established that the prosecution's suppression of "evidence favorable to an accused upon [his] request violates due process where the evidence is material either to guilt or punishment." *Brady,* 373 U.S. at 87–88, 83 S.Ct. at 1196–97. Thus, the rule applies only to impeachment and exculpatory evidence; neutral or inculpatory evidence lies outside its coverage.

■ The *Brady* rule is designed to prevent miscarriages of justice. Consequently, the discovery of a *Brady* violation does not automatically entitle a defendant to a new trial. Reversible error entitling the defendant to a new trial occurs only when the court determines that there is a reasonable probability that the trial result would have been different. *United States v. Bag-*

ley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Reasonable probability is a probability "sufficient to undermine confidence in the outcome of the trial." *United States v. Weintraub,* 871 F.2d 1257 (5th Cir.1989). These principles guide our analysis of the alleged *Brady* violations committed at Nixon's trial. Nixon asserts that five pieces of information that would have impeached Wiley Fairchild's adverse testimony were withheld from him.

■ 1. First, he argues that Wiley Fairchild's plea bargain included an undisclosed promise from prosecutor Weingarten to do what he could to help Wiley's son Drew with drug charges which were pending against him.[1] The district court, having reviewed the record, made a factual finding that no such promise had been made to Wiley Fairchild to procure a plea bargain. Nixon must demonstrate that the habeas court's finding was clearly erroneous.

Nixon makes much of a statement by Weingarten at the evidentiary hearing that "someone hearing what I said to [Wiley's lawyer] *perhaps could have interpreted my words*" as promising to help Drew Fairchild. (emphasis added). This statement, by itself, does little to contradict the finding of the district court that no promise was made. In the overall context of this testimony, Weingarten appears to have been referring to the March 1985 discussions leading up to Drew's federal indictment. Those discussions occurred roughly four months after Wiley effected his plea bargain with the federal prosecutors.

The evidentiary hearing record supports the district court's finding. Weingarten, government attorney Jan Little, and Barry Hess, Wiley's former attorney, all testified that the prosecution's plea bargain with Wiley did not include a promise to help Drew. John Baltar, an assistant to Wiley Fairchild, made contemporaneous notes of the substance of Wiley Fairchild's "informal plea agreement" with the prosecution. Baltar's notes were based on a conversa-

---

1. As the district court found, under the express terms of his plea bargain Fairchild would plead guilty to the gratuity charge; the United States would dismiss the perjury charge against Fair-

child, and the United States would make Fairchild's cooperation known to the sentencing judge.

tion he had with Wiley's attorney Barry Hess shortly after this agreement was reached. According to Baltar's testimony at the evidentiary hearing, "He [Hess] told me what it [the informal agreement] was and I wrote it down." These notes do not mention any promise to help Drew Fairchild. They reflect only that Weingarten told Hess that if Wiley's cooperation provided more evidence than Weingarten anticipated, or if Weingarten's investigation revealed that Wiley was truly a victim in the oil and gas deal with Nixon, then Weingarten would dismiss the gratuity count against Wiley.

In contrast, Nixon contends that testimony by Wiley Fairchild and Baltar avowing such a promise at the habeas hearing proves that the district court clearly erred. Baltar's testimony on this point is contradicted by his contemporaneous notes. Furthermore, Baltar signed two conflicting affidavits on this point. In one affidavit, he stated that discussions with the prosecutors seeking leniency for Drew commenced in early 1985—after Wiley's plea bargain. The other, later-filed affidavit placed these discussions at the time of the plea bargain agreement. Wiley's constantly vacillating testimony, as all parties agree, had to be treated skeptically by the fact finder, who in this case was the district judge. Moreover, Wiley himself characterized this "promise" to help Drew as simply an "impression" that he formed in his own mind. In short, having carefully reviewed the record, we find no basis to overturn this finding of fact.

■ 2. Nixon also alleges that the prosecution concealed the fact that as part of Drew's plea bargain with the federal government, Weingarten had promised not to make a sentencing recommendation for Drew. It is undisputed that Weingarten informed Hess, then acting as Drew's attorney, that he (Weingarten) would not recommend a specific sentence for Drew if he were to plead guilty. Whether or not this statement constituted a promise or inducement which should have been disclosed under *Brady*,[2] this information fails the test of materiality for impeachment of Wiley at Nixon's trial. As the district court found, Nixon failed to prove that Drew's lawyer ever informed Wiley about this aspect of Drew's plea bargain. Thus, such a promise would not impinge on Wiley's credibility.

Even if Wiley had been informed of Weingarten's decision not to recommend a sentence for Drew, this evidence was at best cumulative and at worst immaterial to impeaching Wiley's credibility. Nixon's defense counsel was informed well before trial of requests by Drew and Wiley Fairchild that the government prosecute Drew in federal court. Drew had been federally sentenced before Judge Nixon was tried. It thus borders on the incredible to suggest that the defense could have impeached Wiley any more effectively by knowing of Weingarten's decision not to recommend a sentence for Drew than by knowing (a) that the federal government had intervened against Drew's pending state charges and (b) the outcome of Drew's sentencing. Such evidence, if it was material at all, was merely cumulative in its impeachment capability. *See United States v. McKenzie*, 768 F.2d 602, 609 (5th Cir.1985).

■ 3. Nixon alleges that the decision to prosecute Drew Fairchild in the federal courts was part of an inducement to ensure Wiley's cooperation as a prosecution witness and therefore constitutes *Brady* material. To make his argument, Nixon relies on a portion of a March 22, 1985 internal prosecution memorandum regarding Drew reflecting the prosecution's awareness that removing Drew from state proceedings, whose impartiality had been seriously questioned, would naturally relieve Wiley of one source of anxiety. Both Drew's attorney and the federal prosecutors had reason to believe that Drew's state trial would be used as a vehicle for punishing Drew for cooperating with the federal investigations of Holmes, Royals, and Nixon. The internal memorandum lists four considerations in favor of prosecuting Drew federally: (1)

---

**2.** Nixon's trial and the relevant sentencing discussions occurred before the advent of Federal Sentencing Guidelines. We assume that the potential impact of the government's recommen-

dation of some sentence, or failure to recommend, has diminished under the new federal sentencing procedures.

Drew was unlikely to receive a fair trial in the state system because certain key state officials were friendly with, and controlled by, Holmes; (2) every other participant in the drug arrest had been prosecuted federally; (3) the United States needed to maintain the cooperative attitude of Drew and Wiley in its investigations and prosecutions of Holmes, Bob Royals, and Nixon, and (4) failure to indict Drew federally could jeopardize these investigations and prosecutions. On the other hand, the prosecutors recognized factors arguing against federal prosecution: indicting Drew federally would benefit Drew by removing him from a biased state judge, and this act might reduce his credibility as a witness; and doing so might blunt the case against Holmes.

We do not believe that the withholding from Nixon of the March 22, 1985 internal prosecution memorandum regarding Drew's federal prosecution constitutes *Brady* error. The government's actions here were not veiled in secrecy. On January 7, 1986, well before Nixon's trial, Weingarten sent Nixon's counsel a letter explaining that Hess, acting as Drew's attorney, had contacted the federal prosecutors asking that Drew be indicted federally, and that this was "one of several factors weighing into the decision to recommend an indictment." Nixon's counsel also possessed documents, including Fairchild's grand jury testimony, indicating Wiley Fairchild's concern about his son's criminal case. Since Nixon knew about the request to prosecute Drew federally and the government's decision to do so, and since Nixon knew or should have known about Wiley's interest in Drew's case, the prosecution was not required to provide the actual contents of the memorandum. *See United States v. Ramirez*, 810 F.2d 1338 (5th Cir.1987).[3]

■ 4. Nixon is also mistaken in claiming that Exhibit 20, a 1984 internal FBI teletype sent from the Jackson, Mississippi, office to FBI Headquarters, constitutes *Brady* material. The teletype contains two statements attributed to Wiley Fairchild which Nixon claims are favorable and material to his case: (1) that the phone call from Holmes's farm to Wiley, in which Judge Nixon incriminatingly participated, occurred in December 1982, and (2) that Holmes rather than Nixon placed the call. Wiley's formal proffer of evidence to the government, made almost contemporaneously with the teletypes, does not mention when the call was placed or who placed the call. The district court specifically rejected the evidentiary hearing testimony of Baltar and Wiley that material statements were made during the proffer which were not included in the proffer transcript. Where the court's finding rests on credibility determinations, as it did here, we will not substitute our reading of the evidence for that of the district court.

In any event, the internal FBI teletype does not reflect the actual testimony given by Wiley at the proffer, because the author of the teletype, agent White–Spunner, was not present at the proffer. The teletype represents a third-hand attempt to characterize Wiley's proffer testimony accurately. However, an internal FBI communication made by an agent not present at the event and used to keep the home office apprised of the progress of the case cannot substitute for the actual testimony given at the proffer and cannot be equated with an inconsistent statement made by a witness.

This conclusion is consistent with our recent decision in *United States v. Weintraub*, 871 F.2d 1257 (5th Cir.1989). In that case the defendant argued that the prosecution concealed the fact that some of witness Emrick's trial testimony was not included in the DEA–6 report summarizing Emrick's pretrial statements. The court noted that the DEA–6 reports are not verbatim accounts of a witness's pretrial statements, but rather are concise summaries of the witness's version of the facts as recorded by the agents. As such, the absence of some of the trial testimony from the report was not necessarily a reflection on the

---

**3.** The district court held that this memo was not discoverable under *Brady* because it represented the government attorneys' work product. We need not discuss this rather dubious conclusion because it is clear that the memorandum contained no information that was concealed from Nixon before trial.

credibility of the witness. By analogy, Agent White–Spunner's report does not constitute *Brady* material.

5. The district court found that Weingarten never promised Wiley Fairchild that it would help him obtain a pardon after Nixon's trial. Again, we review this factual finding under the clearly erroneous standard. The district court was entitled to accept Weingarten's testimony that he never promised to help Wiley obtain a pardon. Weingarten did explain the pardon process to someone in the Wiley Fairchild camp, although there is conflicting testimony as to whether or not such a conversation occurred before Nixon's trial. Merely explaining the pardon procedure, however, does not constitute *Brady* evidence. The procedure for obtaining a pardon is published in the Code of Federal Regulations, 28 CFR 1.1, *et seq.*, and is available to any interested person. *See United States v. Burroughs*, 830 F.2d 1574 (11th Cir.1987); *United States v. Drougas*, 748 F.2d 8 (1st Cir.1984).

The district court had ample justification for doubting the credibility of Baltar and Wiley on this issue. Baltar testified at the evidentiary hearing that Wiley never talked directly to Weingarten about a pardon, but that such conversations were held between Baltar and Weingarten. Baltar's two affidavits conflict as to whether Baltar discussed the possibility of a pardon before or after Nixon's trial. In contrast, Wiley testified that he discussed the possibility of a pardon with Weingarten in Baltar's presence. Additionally, although Wiley initially testified that Weingarten promised to help with the pardon, on cross-examination Wiley testified that Weingarten had never made a specific promise to help; rather, Wiley had again merely formed such an impression in his mind. Such "impressions" are not *Brady* material. *See United States v. Baskes*, 649 F.2d 471, 476–77 (7th Cir.1980), *cert. denied*, 450 U.S. 1000, 101 S.Ct. 1706, 68 L.Ed.2d 201 (1981). The district court's finding was not clearly erroneous.

### Recantation of Trial Testimony

Wiley Fairchild testified at the habeas hearing that his trial testimony was errone-ous in regard to two matters: whether Carroll Ingram sought him out to put Judge Nixon in an oil and gas investment before or after Drew's drug bust, and whether Nixon telephoned Wiley from Bud Holmes's farm before or after Holmes passed Drew's state case "to the files", in an attempt to kill it. At trial, he swore that Ingram approached him after the drug bust and Judge Nixon called him before the case was passed to the files. At the habeas hearing, he testified just the opposite. His only explanations for giving allegedly false testimony at trial were that (1) he feared, and therefore wanted to please, prosecutor Weingarten, in order to plea bargain effectively and (2) his brother Rodney refreshed his recollection after trial on the proper chronology.

Motions for new trial based on newly discovered evidence are generally disfavored by the courts and are viewed with caution. *United States v. Adi*, 759 F.2d 404, 407 (5th Cir.1985). The recanting of prior testimony by a witness is ordinarily met with extreme skepticism. *Id.* Consequently, the district court's denial of such a motion will only be disturbed for a clear abuse of discretion. *United States v. Vergara*, 714 F.2d 21, 22 (5th Cir.1983).

According to our general standards, a petitioner's motion for new trial should be granted only if: (1) the new evidence was discovered after trial; (2) the failure to learn of the evidence was not due to petitioner's lack of diligence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) a new trial would *probably* produce a new result. *U.S. v. Rodriguez*, 437 F.2d 940 (5th Cir. 1971) (emphasis added). Our decision in *Adi* arguably follows this general standard rather than the *"Larrison* rule" governing motions for new trial based specifically on false testimony. The *"Larrison* rule" requires that: (a) the court is reasonably well satisfied that testimony given by a material witness is false; (b) that without it, the jury *might* have reached a different conclusion; and (c) that the party seeking the new trial was taken by surprise when the false testimony was given and was unable

to meet it for he did not know of the falsity until after trial. *Larrison v. United States,* 24 F.2d 82, 87–88 (7th Cir.1928) (emphasis in original). *Compare United States v. Adi, supra;* with *United States v. Hamilton,* 559 F.2d 1370, 1372–73 n. 6 (5th Cir.1977); *Newman v. United States,* 238 F.2d 861, 862 n. 1 (5th Cir.1956). Nixon contends that *Adi's* standard of "probability" that the false testimony caused a conviction is more demanding than *Larrison's* criterion that it "might" have changed the outcome of the case. We need not address this question, however, because Nixon's motion founders at an earlier point.

▮ The district court analyzed separately the items of allegedly false testimony given by Wiley Fairchild at trial. The court concluded that even if Wiley committed perjury in testifying that Ingram approached him on Judge Nixon's behalf *after* Drew's drug bust, this testimony was not material to the perjury counts for which Nixon was convicted. The date of the approach bears significantly on whether Nixon accepted an illegal gratuity, a charge against which Judge Nixon prevailed. It has no relevance to whether Judge Nixon discussed Drew's case with Bud Holmes or attempted to influence any person regarding that case. Nixon's brief does not address this reasoning, which we find thoroughly persuasive. Wiley's flip-flop on this testimony could not have legitimately influenced a jury to acquit Judge Nixon of Counts III and IV.

As for Wiley's vacilliation on the timing of Nixon's telephone call, the district court rejected his attempted recantation and held that Nixon did not prove that Wiley's trial testimony was false. For reasons thoroughly aired in its opinion, the district court simply did not believe that Wiley Fairchild had experienced a mental or moral sunrise sufficient to convince the court of his truthfulness at the habeas hearing as compared with Nixon's trial or Fairchild's second grand jury appearance.

Nixon responds to this conclusion with two arguments. He urges that Wiley's recantation should be regarded as more trustworthy than the usual recantation because it went against his penal interest. He also argues, rather puzzlingly, that because Wiley was self-contradictory both at Nixon's trial and at the habeas hearing, the habeas court had no basis for crediting either version of his testimony. We disagree with each of these assertions.

There is no doubt Wiley Fairchild risked indictment for perjury (again) by disavowing in the habeas hearing both his second grand jury and trial testimony. Nixon distinguishes the "disinterestedness" of Wiley's belated "confession" from the lesser credibility of witnesses who might have been threatened or induced into recanting or of codefendants who, after being convicted themselves, have "no more to risk" by coming forward with new testimony. *See, e.g United States v. Metz,* 652 F.2d 478, 480–81 (5th Cir.1981). This general comparison overlooks, however, the fact that all recanting witnesses risk perjury consequences. It provides no useful guide to analysis of an individual case.

Nixon's second argument glosses over his burden of proof as a petitioner for a new trial. He should have at least "reasonably well satisfied" the court that Wiley testified falsely at trial. *See Newman, supra,* 238 F.2d at 862, n. 1. He did not satisfy this standard. To conclude, as the district court did, that Wiley's habeas testimony was incredible is not the same as concluding that his trial testimony must also have been false. The habeas court did not draw the latter conclusion. Likewise, it is illogical to infer that a witness who was "puzzling and inconsistent" both at trial and in his attempted recantation must have lied at trial.[4] The district court's failure to credit Wiley's testimony at the habeas hearing represents a determination which finds support in the record and which we may not lightly overturn.

---

4. At trial, Wiley testified that he received Nixon's phone call from Bud Holmes's farm sometime before Drew's case was passed to the files. On cross-examination, Nixon's defense counsel skillfully led him to admit several times that the call came *after* the case was passed to the files. The government then attempted to rehabilitate him by a disavowal of this admission.

Even assuming Wiley testified falsely on the timing of Nixon's call, there are many reasons to discount its significance for the perjury convictions. First, Wiley's testimony at trial flip-flopped on the timing and was subject to the jury's scrutiny on this account. Second, the perjury convictions did not depend simply upon a three-way credibility battle among Bud Holmes, Judge Nixon and Fairchild. According to Carroll Ingram, the call occurred before the case was passed to the files. Glenn White reported a conversation with Holmes that confirmed this sequence. Most significantly, the fact of the telephone discussion between Wiley and Judge Nixon was acknowledged even by Judge Nixon, and Wiley has never recanted his description of the substance, which clearly implied that Holmes bowed to a request by Nixon for favorable treatment of Drew. The Count III conviction rests on the fact rather than the timing of the discussion. The Count IV conviction is supported by the testimony of Holmes, Ingram, and White.

### Miscellaneous Arguments

Nixon asserts that the trial court failed to consider the cumulative impact of the *Brady* errors on his opportunity to impeach Wiley Fairchild's testimony. Because we have rejected his substantive *Brady* claims, their "cumulative" impact is irrelevant. He also charges that the government knowingly procured false testimony about the alleged "inducements" to Wiley and about his and Drew's plea bargains. This charge also fails as a result of our rejection of the *Brady* claims.

### CONCLUSION

Judge Nixon was not denied a fundamentally fair trial. Wiley Fairchild was vigorously and effectively cross-examined at his trial, and the leniency of Wiley's plea bargain, as well as his interest in his son's case, were thoroughly aired. We are not prepared to overturn the district court's findings and conclusions on *Brady* issues or Wiley's attempt to recant his trial testi-mony. The court did not abuse its discretion in failing to order a new trial.

AFFIRMED.