669 So.2d 44 (1996)
Jessie Derrell WILLIAMS
v.
STATE of Mississippi.
No. 94-DP-00675-SCT.
Supreme Court of Mississippi.
February 15, 1996.
*46 Thomas M. Fortner, Jackson, for Appellant.
Michael C. Moore, Attorney General, Marvin L. White, Jr., Assistant Attorney General, Jackson, for Appellee.
EN BANC.
SMITH, Justice, for the Court:
Jessie Derrell Williams was indicted by a Jackson County Grand Jury for the capital murder of Karen Ann Pierce, committed while he was engaged in the commission of the crime of kidnaping. Venue was transferred to Lauderdale County for trial. In December 1983, Williams was found guilty of the capital murder of Pierce and sentenced to death by virtue of the jury verdict. On January 25, 1984, Williams filed a motion for a new trial which raised inter alia this very issue we now consider. The court held an evidentiary hearing on February 2, 1984, and overruled Williams' post trial motions. On direct appeal, this Court affirmed the guilt-finding phase of Williams' bifurcated trial, but on petition for rehearing, reversed the sentence-determining phase and remanded the case for a new sentencing hearing. See Williams v. State, 544 So.2d 782 (Miss. 1987).
Williams appealed under the Post-Conviction Collateral Relief Act, seeking to vacate his conviction of capital murder on the ground that the State violated discovery rules by withholding a leniency agreement consummated between co-indictee Thomas Terrell Evans and the prosecution, whereby Evans would plead guilty to accessory after the fact and receive five years imprisonment in exchange for turning State's evidence and testifying against Williams. Williams argues that this alleged plea bargain undermines the credibility of Evans to the extent that a new trial is required. Thus aggrieved, Williams presents as his sole issue for review.

WHETHER THE LOWER COURT ERRED IN DENYING HIS MOTION FOR POST-CONVICTION COLLATERAL RELIEF?
A thorough review of this issue leads this Court to conclude that the issue of the plea bargain raised in Williams' motion for a new trial was capable of determination at that point. In fact, the issue was litigated and adjudicated to be without merit, thus Williams is procedurally barred. Foster v. State, 639 So.2d 1263 (Miss. 1994). Williams is not entitled to another evidentiary hearing on this issue. Alternatively, procedural bar notwithstanding, considering Williams' issue on its merit, we find no merit exists. There was no evidence of any "deal." This Court denies Williams' motion for post-conviction relief.

*47 STATEMENT OF THE FACTS  PROCEDURAL HISTORY

This Court, in Williams v. State, 544 So.2d 782 (Miss. 1987), stated "The facts of this case are so bizarre and the methods used to bring about the death of Miss Pierce are so relentlessly savage that no purpose will be served by repeating them here, except where they are essential to the ends of justice in dealing with the issues raised by the appeal." Id. at 784.
Again we note that because of the limited nature of the sole issue presented by this appeal, a brief synopsis of the procedural history of the case and limited facts will suffice.
Williams was convicted of capital murder and sentenced to death on December 15, 1983. Thomas Terrell Evans is Williams' first cousin and co-indictee, and testified against Williams in the original trial in December 1983. During the trial, Evans denied the existence of any plea bargain agreement he had with the State. The prosecution also denied the same. Evans also stated, "I've told the truth all the time, yes sir." At the trial in 1983, Evans was represented by attorneys Fielding Wright and Richard Hamilton.
Following the trial, Williams soon filed a motion for a new trial on January 25, 1984, in the Lauderdale County Circuit Court. In this motion, Williams raised the thorny issue of whether the prosecution withheld the existence of an alleged plea bargain agreement it had struck with the co-defendant Evans. The Lauderdale County Circuit Court held an evidentiary hearing on February 2, 1984, and Williams called the Honorable Michael C. Moore, then the District Attorney for the 19th Circuit Court District, the Honorable Kathy H. King, then assistant district attorney, the Honorable Louis Guirola, Jr., then an assistant district attorney, and his co-indictee, Thomas Terrell Evans, to testify as to whether there had been a deal for Evans' testimony against petitioner. The testimony from all four parties was a resounding "no" to the existence of any deal. Thus, the motion for a new trial was overruled on February 2, 1984, and petitioner perfected an appeal to this Court on February 10, 1984. It is important to note the testimony which occurred during the evidentiary hearing on the motion for a new trial:

(A) District Attorney Michael C. Moore:
District Attorney Mike Moore testified that Fielding Wright, Evans' attorney, first approached the two assistant district attorneys and told them that they had the wrong man in regard to the crime against Karen Ann Pierce. He stated that Mr. Wright informed them that his client's culpability would be equal to one guilty of accessory after the fact only. Moore testified that he knew that Evans was already on probation, and that his probation would most certainly be revoked; however, he also stated that "I can say with certainty that nothing was ever said to Mr. Evans in that regard, or at least with my consent, that he would serve a certain period of time in the penitentiary, because we can't  there is no way we can tell." Moore further stated, "I've never discussed what we would recommend in return for his testimony with Mr. Evans. As a matter of fact, the only thing I've ever told Mr. Evans is that I don't have any recommendation." Prior to trial, there were no tentative agreements as to recommendations from the State if Evans were to plead guilty to a crime.

(B) Assistant District Attorney Kathy King:
Assistant District Attorney Kathy King's testimony echoed that of Moore's. She also stated that Fielding Wright approached them and stated that Evans could tell them who was the real killer of Pierce. Wright told her that based on what Evans had already told him, Evans was not guilty of anything more than accessory after the fact. King stated that she and Wright then discussed what kind of offer might be made for Evans since he was already on probation. However, she never promised Wright anything since the prosecution team had not yet spoken to Evans himself. She said that she made it clear to both Evans and Wright that there would be no deal if Evans' version of the story did not match up with all of the other evidence and testimony of the other co-indictees. Because there were many discrepancies *48 between Evans' testimony and that of Williams and the other co-indictee, Norwood, King stated that a deal was "up in the air," and in her mind, "there was no deal," in light of the indictments handed down by the grand jury. The only discussion she had with Fielding Wright post-indictment was when Wright inquired as to what happened, and she responded, "`Fielding, obviously the grand jury didn't believe all the facts as your man told them after they heard all the evidence, and they saw fit to indict him.' And that's all I ever said to Fielding after that." She further stated that "[t]he only other time I kn[e]w anything about any deals even being discussed was some time before the trial was set... . Terrell Evans was in our office and ... when Mike [Moore] told him there were no deals, there were not going to be any deals." "I don't remember Mike's exact words, but Mike said as far as he was concerned, he would go with the death penalty for him [Evans] too."

(C) Assistant District Attorney Louis Guirola, Jr.:
Mr. Louis Guirola, Jr. also corroborated his fellow prosecutors' testimonies, stating that "[t]he only thing [he] ever heard prior to the trial date and extending back was that Mr. Moore told Mr. Evans specifically that he did not have a deal, he did not have any recommendation and that as far as he was concerned, ... he [wa]s facing the death penalty too." He testified that Moore asked Evans' at least twice whether he understood that he had no deals, and both times, Evans responded, "Yes, I understand." He further noted that this "happened on more than one occasion, because it would go on at each individual interview so that he would understand at each interview that he did not have a plea negotiation."
Mr. Guirola gave the most detailed account of the exchanges between the district attorney's office and Fielding Wright, as follows:
[L]et me ... start[] at the beginning. When this investigation first took place, there were bits and pieces of information that would come into the Sheriff's Office and then they would make arrests based on these bits and pieces of information. During their investigation, they arrested two individuals, one I believe was John Paul Adams and the other one,... Mitchell Byrd... . Sometime later during the investigation, Thomas Terrell Evans was arrested but he was not charged with capital murder at that time and we weren't even sure of what his involvement was.... I think it might have been the next day or next afternoon, Mr. Fielding Wright came into our office and announced that he was representing Thomas Terrell Evans. And, at that time, he made the statement  and I remember this vividly, because it shocked me  he said, `You've got the wrong people charged with capital murder, and I know who did it.' Well, of course, at that point Miss King was present too and we were very interested... . And, Mr. Wright said, `Well, of course, I can't tell you what my source of information [is]. I can only tell you that I know who did it and you've got the wrong people in jail for capital murder.' Well, it didn't take a genius to understand that if he's representing Thomas Terrell Evans and he comes in and makes that kind of a statement that, obviously, Mr. Wright's source of information was Thomas Terrell Evans. At that point, Mr. Wright said `Well, if I am able to bring some information forward that will get you the right man, what would this office be willing to do?' At which point myself and Miss King both told him, `We can't make any recommendation. We can't say anything at this point because we don't even know who it is or what he will say.' ... [Wright] gave us an outline of what the person knew and who he knew to be the actual killer of the victim ... and that [his source] could be guilty of nothing more than accessory after the fact to capital murder, which if you took the facts as Mr. Wright perceived them and he was told them, arguably that would have been the charge. So, at that point, I believe Miss King and I both told Mr. Wright, `Well, if this is true, if these facts are right down the line as you have told us, there is no way that you could convict that man of anything more than accessory after the fact to capital murder, which carries a maximum penalty of five years in the penitentiary.' *49 Now, at that point  let me make it clear  that was not a recommendation that was made, that was an observation that that would be the maximum penalty for that particular crime.
At that point, Evans was brought in for an interview. After the interview, there was some discussion about what Evans would get if his story was true. Guirola told Wright again,
`If what your man is saying is true, then the maximum penalty would be five years in the penitentiary, and since he is in fact on probation now, that probation would be revoked and he would get five years consecutive with five addition years for accessory after the fact.' I still did not perceive that as a recommendation, because all of the facts were not in, all of the testimony was not in. But, I thought that in my opinion that's what would happen if all these facts were true... . I didn't think we were in the position to ... make any firm recommendation.
After the case went before the grand jury, they indicted Evans for capital murder, too.
Now since the time of the indictment, and I would say sometime before, at no time has Terrell Evans been told `you've got a deal with the District Attorney' or `we're going to reduce something,' because there was nothing to reduce at that point... . As a matter of fact, that has been to the contrary. Mr. Moore has always told Mr. Evans, `Be sure that you understand you do not have any kind of recommendation, you do not have any kind of deal. You are charged with capital murder and as far as I'm concerned you are facing the death penalty too.' At which point Mr. Evans would always indicate that he understood.
The above detailed account by Guirola indicates that there was no plea bargain agreement between the State and Evans.

(D) Co-indictee Thomas Terrell Evans:
Evans was the final witness to testify. His attorney, Fielding Wright, was in the courtroom on that date, but has since passed away. Evans testified that he did not feel like he ever had any kind of tentative agreement with the district attorney. He also stated that there was no discussion between him and the district attorney's office regarding a possible sentencing recommendation. He testified that there was some discussion about the revocation of his probation. Upon such response, the following exchange took place:
BY MR. WRIGHT: Your Honor, as to the revocation I don't mind what he asked him. As to anything that has to do with his capital murder charge, I want to instruct him not to answer, whether it be in regard to plea bargaining or what.
BY THE COURT: All right.
BY MR. FORTNER: Judge, I'm not quite sure ... are you agreeing with Mr. Wright that the man can't answer the question concerning plea negotiations with the District Attorney's office about his capital murder charge?
BY THE COURT: Is that what you don't want him to answer?
BY MR. WRIGHT: That's what I'm talking about, because as far as I know there have never been any discussion except with me, and if there has been some other discussion I instruct him not to answer.
BY MR. FORTNER: Now I'm not asking him about any information that was verbally discussed between himself and his attorney. That's not what I'm asking the witness. What I'm asking the witness is about any discussion he, the witness, might have had with the District Attorney.
BY THE COURT: All right. Now then, he can answer that, but if his information came from his attorney then he is not required to answer that.
BY MR. WRIGHT: Just to clarify the record, the reason is that he still is charged and could, if I desire ultimately to talk to the D.A. again, it may hurt him. So, I instructed him not to answer in regard to anything that has passed between he and myself nor as to anything in the future.
BY THE COURT: All right. Do you understand that, Mr. Evans?
BY THE WITNESS: He said what's between me and him is between me and him?

*50 BY THE COURT: He's saying don't answer as ... to any information you've gained in a discussion with your attorney. Anything  personal discussions you had directly with either Mr. Moore, Mr. Guirola or Mr. King?
BY MR. FORTNER:
Q. Mr. Evans, in the course of your interview sessions with the District Attorney, Mr. Moore, or the Assistant District Attorneys, Miss King or Mr. Guirola . . concerning a potential possible recommendation of sentencing on a guilty plea by you to any crime emanating from the incident involving .. . Pierce.
A. Only on my probation, that's the only thing. (emphasis added.)
Q. Did you ever discuss with them the possibility of a five year sentence for a guilty plea on accessory after the fact with the District Attorneys now, not with your attorney.
A. No sir. (emphasis added.)
Q. Did you ever discuss with them the possibility of a guilty plea to capital murder and a seven year sentence  a recommendation for seven years running concurrent with the revocation of five years.
A. No sir. (emphasis added.)
Q. Did you ever discuss any type of sentencing with the District Attorneys?
A. Yes sir ... I asked them about my probation and they explained it to me... . [W]hat I was interested in was whether my restitution time would count or not. (emphasis added.)
Q. Do you ever remember, in a discussion with the District Attorney or anyone in his office, the Assistant District Attorneys, the word "deal" being mentioned at all? A deal?
A. I'm sure it was, but it wasn't the kind of deal that you're speaking of, I don't think... . I know Mr. Moore said I tried to run a "shady deal" on him one time. (emphasis added.)
Q. Did you ever ask if there was a deal.
A. I've never asked nobody in the District Attorney's office, no sir. (emphasis added.)
Q. Did they ever discuss a deal with you, plea negotiation deal is what I'm talking about? ...
A. No sir, I let my lawyer handle all of that. (emphasis added.)
Q. Did they ever talk to you about their [sic] being no deal?
A. Yes sir ... on December the 13th, 1983. Mr. Moore informed me in front of my attorney, Mr. Wright, that we had no deal, that me and him had no deal whatsoever and he wanted me to understand that well. He repeated it twice and I understood exactly what he said. ... (emphasis added.)
On March 15, 1985, Williams filed a Motion for Court to Re-open Record and Hearing on Defendant's Amended Motion to Set Aside Verdict and Grant a New Trial. To this motion, Williams attached the recanting affidavit of Evans and supporting affidavits of a co-defendant, Michael Norwood, Clifford Bonin and Ricky Rogers, all trustees in the Jackson County Adult Detention Center. These affidavits alleged that Evans had told them that he had a deal with the District Attorney for his testimony against Williams. Evans in his affidavit stated that "[he] was promised a sentence of five years for [his] testimony against ... Williams, ... [t]hat [he] received a sentence of five years for [his] testimony, ... [t]hat [he] was threatened by the District Attorney, Michael C. Moore, that he would `put gas to [his] ass,' and [t]hat [therefore, his] testimony against ... Williams was colored by the threats and suggestions of ... Moore." This motion was overruled on March 29, 1985, because the Circuit Court had no jurisdiction to entertain such a motion after the perfection of the appeal.
Five years later, the affidavit of Richard Hamilton, Evans' attorney, was attached to this list of affidavits. The Hamilton affidavit[1] was executed on January 9, 1990, six *51 years after the original trial. Williams has not yet provided any written documentation of the plea bargain itself. Moreover, there is no affidavit from attorney Fielding Wright. Fielding Wright did not pass away until December 12, 1990. Williams had at least 11 months after the Hamilton affidavit was released in which to supply an affidavit from Wright confirming or denying the existence of any agreement.
Williams argues that these affidavits support his contention that the prosecution failed to disclose the existence of a plea bargain it had with Evans in return for Evans' testimony against Williams. Aggrieved at the lower court's decision, Williams petitions this Court to grant his motion for post-conviction collateral relief and remand the case for a new trial.
Also pertinent to this discussion are statements made by Evans in Williams' direct appeal. On appeal, Williams' conviction and sentence were affirmed. However, on a petition for rehearing, this Court vacated the sentence of death and remanded for a new sentencing hearing. See Williams v. State, 544 So.2d 782 (Miss. 1987). Petitioner was again sentenced to death by a jury in the George County Circuit Court in January 1990.
During the George County resentencing hearing in January 1990, Evans testified, as follows:
Q. (Asst. D.A. Bob Evans): ... Is there anywhere .. . the then District Attorney, Mike Moore, [says] I'm going to threaten you and make you tell a lie on the witness stand? ...
A. (Thomas Evans): No sir. He was ... insisting to stay away from that... .
Q. And Mr. Fortner made some allusion to some of your testimony in the last trial and this trial about did he [Moore] promise you anything. Am I correct in saying you're saying that he [Moore] didn't promise you anything; there was just a kind of understanding?...
A. As my lawyer [Fielding Wright] explained it to me  ... "I give you my word that, if you testify and tell the truth and don't screw everything up, that you will receive exactly what you're guilty of, which is accessory after the fact." ... "But, ... if you want to go to trial, ... I won't charge you no more money than I've already charged you." ... "But now, I do have an understanding with Mike Moore that, if you do testify that you  if, in fact, accessory after the fact is what you're guilty of, that's what you will be tried for and that's what you will receive the five years on."
Q. And in the last trial, you testified about who was the perpetrator of this crime, and in this trial. Were you telling the truth then?
A. Yes, sir.
Q. And he told you to tell the truth; didn't he?
A. Yes. That's correct, also.
BY THE COURT: But what did he say for you to say whenever you was [sic] asked if you had made a deal?
BY THE WITNESS: He said that, unless they specifically ask me if I had an understanding through him, a promise from him that he had a promise from somebody else in the District Attorney's Office, that the answer was no because I did not have a 
BY THE COURT: And he told you to say that, no, that you did not have a deal; is that right?
BY THE WITNESS: That's correct.
BY THE COURT: All right. Anything else?
BY MR. FORTNER: No, sir.
It is important to note that Evans' recanting affidavit executed in 1985, stated that he *52 and the prosecution had a plea bargain. The above 1990 statements by Evans recant his 1985 recantation. Williams returned to his original understanding of the discussions between his attorneys and the district attorneys office. An "understanding" between Wright and Moore that if Evans' testified against Williams and it was believed that his participation in the crime amounted to no more than accessory after the fact, which carried a maximum sentence of five years, is not the equivalent to a plea bargain agreement. It is merely a statement of the obvious. Not only did Evans recant his 1985 recantation, he also told this Court that his attorney told him to tell the truth in the original 1983 trial, and that he indeed was truthful during the original trial.

DISCUSSION OF THE LAW
Post-conviction proceedings are for the purpose of bringing to the trial court's attention facts not known at the time of judgment. Smith v. State, 477 So.2d 191 (Miss. 1985). Post-Conviction Collateral Relief Act provides procedure limited in nature to review those matters which in practical reality, could not or should not have been raised at trial or on direct appeal. Turner v. State, 590 So.2d 871 (Miss. 1991).
Procedural bars of waiver, different theories, and res judicata and exception thereto as defined in post-conviction relief statute are applicable in death penalty post-conviction relief application. Lockett v. State, 614 So.2d 888 (Miss. 1992), cert. denied, ___ U.S. ___, 114 S.Ct. 681, 126 L.Ed.2d 649 (1994). We have repeatedly held that a defendant is procedurally barred by waiver from making a challenge to a capital sentencing scheme as a whole in a petition for post conviction relief where the issue was capable of determination at trial and/or on direct appeal but was not raised, and defendant failed to show cause or actual prejudice for not raising the issue on direct appeal. Lockett v. State, 614 So.2d 898 (Miss. 1992), cert. denied, ___ U.S. ___, 114 S.Ct. 681, 126 L.Ed.2d 649 (1994); Smith v. State, 477 So.2d 191 (Miss. 1985). Post-conviction relief is not granted upon facts and issues which could or should have been litigated at trial and on appeal.
Applying the law to the facts at hand, Williams is not entitled to relief under our Post-Conviction Collateral Relief Act. He is procedurally barred from making a challenge to his capital sentence since the issue of the plea bargain was raised in his motion for a new trial, and it was capable of determination at that point, and in fact was litigated, and adjudicated to be without merit. "The doctrine of res judicata shall apply to all issues, both factual and legal, decided at trial and on direct appeal." Miss. Code Ann. § 99-39-21(3) (Supp. 1994).
At the hearing on this issue, Williams called District Attorney Mike Moore, and Assistant District Attorneys Kathy King, Lou Guirola, and co-indictee Evans. There was a full and fair hearing, and the testimony of every witness corroborated each other. There was an opportunity for cross-examination and the detailed testimony set out in the statement of facts reveals absolutely no contradictions in the stories between Evans, his attorney Fielding Wright, and members of the prosecution. Moreover, Wright and Hamilton could have been called to the stand at the evidentiary hearing, but weren't. Because some of these factual issues were not pursued in the lower court, Williams' argument fails due to the principle of res judicata.
Furthermore, no appeal was taken from the trial court's denial of relief. Thus, this claim for post-conviction relief was waived when not appealed. A post-conviction petitioner is entitled to in-court opportunity to prove his claims if the claims are procedurally alive substantially showing denial of a state or federal right. Washington v. State, 620 So.2d 966, 968 (Miss. 1993). At this point, Williams' claims are neither procedurally alive, nor capable of demonstrating the denial of a state or federal right.
Even though this argument is procedurally barred, we will nevertheless alternatively look at the merits and consider the existence of the recanting affidavits. This Court in Chase v. State, 645 So.2d 829 (Miss. *53 1994), cert denied, ___ U.S. ___, 115 S.Ct. 2279, 132 L.Ed.2d 282 (1995), stated:
Although the procedural bar is sufficient, this Court also, alternatively looks to the merits of the underlying claim knowing that any subsequent review will stand on the bar alone.
Chase, 645 So.2d at 835, citing Sawyers v. Collins, 986 F.2d 1493, 1499 (5th Cir.1993); See also Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). This Court has held that:
[r]ecantation by a witness called on behalf of the prosecution does not necessarily entitle accused to a new trial... . The question whether a new trial shall be granted on this ground depends on all the circumstances of the case, including the testimony of the witnesses submitted on the motion for the new trial, and its determination is left to the sound discretion of the trial court free from interference except for abuse of such discretion.
Bradley v. State, 214 So.2d 815, 817 (Miss. 1968) (emphasis added). Thus, even on the merits, Williams is not automatically entitled to a new trial; we must consider all of the circumstances of this case, including the testimony of the witnesses Evans, Moore, King and Guirola. This Court held that in order
[t]o be persuaded by such [recantations,] would be to place the control of the courts in the hands of corrupt witnesses who could by successive repudiations of their testimony cause the issue to oscillate at will, and make of perjury a basis for relief at the hands of the law which they had defied.
Bradley v. State, 214 So.2d 815, 817 (Miss. 1968), quoting Dolan v. State, 195 Miss. 154, 13 So.2d 925 (1943). "Moreover, recanting testimony is exceedingly unreliable, and is regarded with suspicion; and it is the right and duty of the court to deny a new trial where it is not satisfied that such testimony is true." Bradley v. State, 214 So.2d 815, 817 (Miss. 1968). The fact that a witness changes his testimony after the trial is not alone an adequate ground for granting a new trial. Peeples v. State, 218 So.2d 436, 438 (Miss. 1969).
We approach the recanting testimony of Evans with great suspicion. Attorney Hamilton's affidavit is equally suspect as it came six years after the fact, and his co-counsel Fielding Wright never executed any affidavit confirming or denying the existence of a plea bargain agreement with Evans. Furthermore, Evans recanted his 1985 recantation in Williams' 1990 resentencing hearing. In the 1990 hearing, Evans testified that he had no deal with the prosecution, and that he did not lie at the original trial in 1983. Because of these underlying reasons, we are not satisfied that Evans' testimony via the 1985 recanting affidavit was truthful.
In a death penalty case, admission of perjured testimony mandates a new trial, where there is a reasonable probability that a different result will be reached in the new trial without the perjured testimony. Smith v. State, 492 So.2d 260, 264 (Miss. 1986). Only where a witness recantation undermines the circuit court's confidence in the correctness of the outcome at trial should a new trial be ordered. Yarborough v. State, 514 So.2d 1215, 1220 (Miss. 1987).
In the case sub judice, we hold that there is no reasonable probability that a different result would be reached in a new trial, even assuming that Evans' initial testimony against Williams was perjured. In this case, Evans' 1985 recantation combined with the surrounding facts cannot undermine the court's confidence in the correctness of the outcome at trial.
First, Evans repeatedly stated that he had "no deal" with the prosecution in the motion for a new trial. He completely corroborates the testimonies of the three prosecutors during the motion for a new trial held in early February 1984. All of the prosecutors and Evans agreed at the evidentiary hearing on the motion for a new trial that the prosecuting attorneys merely stated that if Evans told the truth and his version of the incidents were believed, the most he could get under the statute was five years for accessory after the fact. There is no way the prosecution could have recommended that the judge give him lenient treatment and sentence him to only five years, when the maximum one can serve for accessory after the fact is five *54 years. Evans stated that the only discussion he had concerned his probation and revocation. Moreover, Williams said that District Attorney Moore twice asked him whether he understood that he did not have a "deal," and he stated that he understood this both times while in the presence of his attorney. In a side bar, his attorney, Fielding Wright, also made statements indicating that he was not aware of any plea agreements or discussions between his client and the prosecution. Evans testified that he never approached the prosecution about a plea bargain. The prosecution was emphatic that it never offered a plea bargain to Evans. This evidence leaves little doubt that a plea bargain agreement never existed. Besides, it would appear odd to penalize the prosecution for just repeating the obvious, making legal observations, and making predictions as to the outcome of the case based on Evans' initial statements to them.
Second, and perhaps the most telling fact is that plea bargains are generally not oral; as a rule of thumb, they are usually written documents. If one existed, why was it not attached to the record either in the original Motion for a New Trial or in the Amended Motion to Set Aside Verdict and Grant a New Trial or with the Hamilton affidavit? The absence of a written plea bargain agreement in the record is presumptive on this Court's part that none existed.
Third, Evans in his 1985 recanting affidavit never stated that he perjured his testimony during the 1983 trial. Nor does Evans' claim to have changed his testimony due to any "deal." He merely states that his testimony was "colored." Later, in the 1990 sentencing hearing, Evans specifically states that he told the truth at the December 1983 trial. In 1990, Evans returned to his 1983 trial testimony stating that he had no deal with the prosecution before December 1983, and that he told the truth back then during the original trial. Discounting his flimsy affidavit, Evans has repeatedly acknowledged the very obvious in this case  if he told the truth, and his version of the story was believed, then as a matter of fact and law, Evans could be guilty of no more than accessory after the fact and at the very maximum receive a sentence of five years. An understanding of this most basic reality is not the same as the existence of an implied plea bargain agreement of leniency.
Because of these facts, not only is the 1985 recanting testimony of Evans suspicious, it appears untruthful. We hold that it does not undermine the confidence in the outcome of the original verdict against Williams.
The burden in this matter is on the defendant to prove two elements: (1) sufficiently prove the perjury existed by showing that the recantation was material, and (2) the result of a new trial would be different than the one reached. Moore v. State, 508 So.2d 666, 668-69 (Miss. 1987); see Nixon v. U.S., 703 F. Supp. 538 (S.D.Miss. 1988), aff'd, 881 F.2d 1305 (5th Cir.1989). In Moore, where the defendant was convicted of manufacturing controlled substances, the Court held that he was not entitled to a new trial when a recanting witness claimed that the marijuana was hers, since the defendant failed to sufficiently prove perjury, and the result of a new trial would not have been different. Moore v. State, 508 So.2d 666, 669 (Miss. 1987). In Nixon, the Court found that where a witness against petitioner recants his testimony on allegedly undisclosed promises and inducements made to him by prosecution, such recantation must be material to the conviction or would not have led to acquittal during a new trial. Nixon v. U.S., 703 F. Supp. 538, 561 n. 11 (S.D.Miss. 1988), aff'd, 881 F.2d 1305 (5th Cir.1989).
Evans' 1985 recanting affidavit is simply insufficient to justify another evidentiary hearing, much less a new trial. Williams has not successfully established that the perjury existed because Evans' recantation was recanted in 1990. Evans himself stated that he told the truth during the original trial, five years after his recanting affidavit was born. Even looking at the face of this odd 1985 affidavit, Evans does not state that he lied. He merely claimed that his testimony was "colored."
The affidavit of Hamilton is likewise deficient because it fails to specify the date of the negotiations culminating in an agreement. Hamilton's affidavit is silent concerning the assertions found in Evans' affidavit, *55 that Evans was informed of the promise by Wright and that Hamilton told Evans that he would die in the gas chamber if he did not accept the alleged deal offered by Mike Moore. Next, why didn't attorney Hamilton submit a written plea bargain along with his affidavit? As a "licensed, practicing attorney" in this State, surely he knows that a plea bargain should be reduced to writing. Does Williams expect this Court to believe that on the basis of a supposed oral plea bargain, criminals should be allowed to recant their testimony for their criminal brethren, and "cause the issue to oscillate at will, and make of perjury a basis for relief at the hands of the law which they had defied." Bradley v. State, 214 So.2d 815, 817 (Miss. 1968) (citation omitted).
Finally, there was no affidavit from Fielding Wright on this matter. Without more than that which has been provided in the affidavit of Williams' first-cousin/co-indictee/criminal Thomas Terrell Evans, this Court would be allowing a complete abuse of the appellate process by letting insufficient or deficient affidavits be the guide as to whether a plea bargain actually existed in violation of the discovery rules.
These affidavits do not warrant recognition because they do not constitute newly discovered evidence. Newly discovered evidence warrants a new trial if the evidence will probably produce a different result or verdict; further, proponent must show that evidence has been discovered since trial, that it could not have been discovered before trial by the exercise of due diligence, that it is material to the issue, and that it is not merely cumulative, or impeaching. Ormond v. State, 599 So.2d 951, 962 (Miss. 1992). The court must be satisfied that the evidence came to defendant's knowledge since trial, could not have been discovered sooner by diligence, and would probably produce different result, if new trial were granted. Gaston v. State, 562 So.2d 61, 63 (Miss. 1990). Granting or denying a new trial based on newly discovered evidence is within discretion of trial court, and Supreme Court will not overrule a trial court unless it abused that discretion. Ormond v. State, 599 So.2d 951, 962 (Miss. 1992).
Returning to the case at bar, the lower court did not deal with the affidavits because of a lack of jurisdiction, as opposed to the merits. However, even on the substance of the affidavits, they do not constitute newly discovered evidence, primarily because the Evans affidavit or the Hamilton affidavit could have been garnered much earlier. As previously discussed, these two affidavits would not produce a new trial because there is still no written documentation of this alleged plea bargain agreement, because there is no accompanying affidavit from Fielding Wright, and because the affidavits of Evans and Hamilton are fatally deficient in and of themselves. Moreover, the 1990 testimony of Evans completely negates everything stated in the 1985 recantation affidavit. When Williams requested and obtained an evidentiary hearing on this matter, he was required to exercise reasonable diligence in presenting all the evidence he could muster. He didn't call Wright or Hamilton to testify, yet they were readily accessible. The failure to exercise due diligence cannot allow these affidavits to constitute newly discovered evidence.

CONCLUSION
Williams claims he is entitled to an evidentiary hearing because the credibility of Evans has been so undermined that a new trial is required. Bear in mind the following: There are deficiencies in the affidavits of Hamilton and Evans. Hamilton executed an affidavit six years after the fact. Fielding Wright never executed an accompanying affidavit to buttress co-counsel Hamilton's affidavit. Wright and Hamilton could have been called to give evidence at the evidentiary hearing, but they did not testify. That there could be a plea bargain for a five year sentence, when the maximum sentence that a person guilty of accessory after the fact could serve is five years, is indeed suspect. Evans recanted his 1985 recanting affidavit during Williams' 1990 sentencing hearing, stating that he had no deal and that he had told the truth at all times. Besides, in the 1985 affidavit, Evans did not say he lied or changed his testimony during the 1983 trial because of any "deal." He only said his testimony was "colored." Plea bargains generally should be *56 reduced to writing yet, there is absolutely no written plea bargain agreement. Because of these deficiencies, this Court denies Williams' motion for post-conviction relief. Williams has failed to establish that there existed material perjury, and therefore, he cannot shake this Court's confidence in the outcome of his case.
DENIAL OF POST CONVICTION RELIEF AFFIRMED.
PRATHER and SULLIVAN, P.JJ., and BANKS, JAMES L. ROBERTS, Jr., and MILLS, JJ., concur.
DAN M. LEE, C.J., concurs in result only.
PITTMAN and McRAE, JJ., not participating.
NOTES
[1] Attorney Hamilton stated that:

[i]n exchange for the cooperation and testimony of Evans at any trial of the coindictees, it was agreed that Evans would be allowed to plead guilty to a lesser charge of Accessory After the Fact to Capital Murder and that the District Attorney would recommend to the sentencing judge that a sentence of imprisonment of five (5) years be imposed upon Evans. Further, it was agreed that a suspended sentence of seven (7) years for burglary previously imposed on Evans, would be revoked and that the seven (7) year sentence and five (5) year sentence would run consecutively.
After Evans testified against Williams at trial, the plea agreement between Evans and the District Attorney was fulfilled, and the sentencing judge imposed a sentence upon Evans exactly as previously agreed.