ISHEE, J.,
for the Court.
¶ 1. Brett Jones, Jr. was convicted of murder in the Circuit Court of Lee County and sentenced to life imprisonment in the custody of the Mississippi Department of Corrections (MDOC). Aggrieved, Jones appeals. Finding no error, we affirm.
FACTS
¶ 2. During August of 2004, Jones was living with his paternal grandparents, Ber-tis Jones and Madge Jones. Jones’s girlfriend, Michelle Austin, had run away from home in the first week of August 2004. Austin was staying mostly at Jones’s grandparents’ home, as well as at an abandoned fish restaurant near the home. One August 9, 2004, Bertis Jones discovered Austin in Jones’s bedroom and told her to get out of his house. Austin then ran to the fish restaurant. According to her testimony at trial, both Jones and his cousin, *314 Jacob, later came and told her that Jones was “in big trouble” with his grandfather. Austin - testified that she asked Jones, “What are you going to do? Kill him?” Austin testified that Jones did not respond to this question. Austin also testified that Jones “said that he was going to hurt his granddaddy.”
¶ 3. Jones testified that at about 4 p.m., he went into the kitchen to make a sandwich, and he and the victim got into an argument. Jones “sassed” him, at which point the argument escalated. Jones testified that his grandfather got in his face, pointing and yelling at him. He testified that his grandfather had never done that before. He testified that his grandfather then pushed him, that he pushed him back, and his grandfather then swung at him. Jones testified that he had a steak knife in his hand from making a sandwich, and because he “didn’t have anywhere to go between the corner and him,” he “threw the knife forward,” stabbing his grandfather. He testified that his grandfather backed up, looked at the wound, and came at Jones again. Jones again stabbed him and tried to get past his grandfather. Jones testified that his grandfather grabbed him, they fought some more, and Jones then grabbed a filet knife. He stabbed his grandfather with this knife. Jones testified:
I was stabbing him because I was afraid, I didn’t know anything else to do because he was so huge. He’s not really a big looking man until he gets in your face with his hands 'up and swinging at you, and then he turns into a giant. And you just feel like there’s no way out, no way to get away from him.
After they “got outside,” Jones testified that he knew his grandfather was going to die if he did not try to save him, so he tried to administer CPR. He then tried to carry his grandfather, who was not breathing at that point, into the house “[mjostly to get him out of the yard.” Jones then pulled the body into the laundry room and shut the door. Jones used a water hose to try and clean the blood off of his arms, and then threw his shirt in the garbage under the sink. He then attempted to cover up the blood spots in the carport by pulling his grandfather’s car over them. Jones testified that he walked around the house and saw Robert “Frisco” Ruffner; at this point, Jones was covered in blood.
¶ 4. Ruffner, who was living with and doing yard work for Thomas Lacastro, a neighbor at the time, testified that he had “heard an old man, you know, like holler out he was in pain,” and about two or three minutes later, he saw Jones walking toward him covered in blood. Ruffner testified that Jones was carrying a knife, trembling and saying, “Kill, kill.” Ruffner then ran into the house and called 911.
¶ 5. Thomas Lacastro arrived while Ruffner was on the phone with the police, and Ruffner related to Lacastro what he had seen. Ruffner was hysterical at the time, and Lacastro did not, at first, believe him.[1] Ruffner told Lacastro that Jones had killed his grandfather. Lacastro then saw Jones in the bushes and asked him to come over to his house. Lacastro testified that Jones was pale and “had some blood on him.” Lacastro testified that he asked Jones, “Where’s your grandfather?” Jones answered, “He’s gone,” and Lacas-tro responded, “No, he’s not gone. His car is right there, Brett.” Jones again tried to say that his grandfather had left, but Lacastro told him, “Brett, you’re lying. You need to get out of my yard.” At some point during the conversation, Jones told Lacastro that the blood was fake and that “it’s a joke.” Lacastro responded, “It’s *315 not a joke, son. This is not a joke. This is real.”
¶ 6. Lacastro testified that Jones then went back toward the bushes, where he met a young lady. He testified that the two walked “up and down the bushes ... [a]nd then ... out toward the levee.” La-castro told Jones before he left that he had called the police. After Jones and the young lady left, Lacastro went over to the bushes where they had been “milling around” and saw an oil pan covered in blood. He then went into the carport and saw more blood, but did not go any farther.
¶ 7. Jones testified that when he left the property, he was trying to go to Wal-Mart to meet his grandmother because he “wanted to tell her what happened.” He and Austin ran through the woods to a convenience store, where a man asked them if they needed a ride. Jones testified that they got to a gas station in Nettleton, Mississippi, and were trying to get a ride to the Wal-Mart in Tupelo, Mississippi, when police apprehended them.
¶ 8. Jones and Austin gave the officers false names. Officer Gary Turner of Net-tleton began a pat-down of Jones and found a pocketknife in his left pocket. Officer Turner asked whether it was the knife Jones “did it with,” to which Jones responded, “No, I already got rid of it.”
¶ 9. When Investigator Steve White went to investigate the home of Bertis Jones, he found Bertis Jones’s body concealed in a utility room in the back of the carport. He found that someone had apparently used a car, an oil pan and a mat to conceal puddles of blood. Investigator White also found a bloodstained T-shirt in the carport, as well as more bloodstained clothing in the kitchen trash can. Officers also found a filet knife in the kitchen sink and a bent steak knife with blood on the tip of it. There were blood spatters on the walls.
¶ 10. There were a total of eight stab wounds to the body of Bertis Jones. There were also abrasions consistent with the body’s having been dragged, and cuts on the hand classified as “defensive posturing injuries.” The cause of death was a stab wound to the chest.
¶ 11. Jones was convicted of murder in the Circuit Court of Lee County and sentenced to life imprisonment in the custody of the MDOC. Aggrieved, Jones appeals, asserting the following: (1) that the trial court erred in denying his motions for directed verdict; (2) that the verdict was against the overwhelming weight of the evidence; and (3) that the trial court erred in allowing into evidence photographic exhibits 9, 31 and 32.
ISSUES AND ANALYSIS
I. Whether the trial court erred in denying Jones’s motions for directed verdict and JNOV.
¶ 12. A motion for directed verdict challenges the legal sufficiency of the evidence, and has the same standard of review as a denial of a peremptory instruction or JNOV. Vaughn v. State, 926 So.2d 269, 271(¶ 4) (Miss.Ct.App.2006) (citing McClain v. State, 625 So.2d 774, 778 (Miss.1993)). We review the trial court’s finding regarding the sufficiency of the evidence at the time the motion for directed verdict was overruled. Vaughn, 926 So.2d at 271(¶ 4) (citing Holloman v. State, 656 So.2d 1134, 1142 (Miss.1995)). “ ‘[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt.’ ” Id. (quoting Bush v. State, 895 So.2d 836, 843(¶ 16) (Miss.2005)).
*316 ¶ 13. The jury in the case sub judice found that Jones did willfully and with malice aforethought or deliberate design kill Bertis Jones, without any authority of law, and not in necessary self-defense. Jones asserts in his brief that “there were no eye witnesses to any crime committed by [Jones].” He further points to his claims of self-defense and the fact that his grandfather was a larger man than Jones. He then proceeds to attack Austin’s testimony as self-serving, and notes that she testified at trial that she would “lie to save herself.”
¶ 14. While all this may or may not be so, it is not our place to assume the role of jury. Rather, we must, viewing the evidence in the light most favorable to the prosecution, determine whether any rational trier of fact could find Jones guilty of the elements of the crime beyond a reasonable doubt. Viewing the evidence in such a light, it is clear that a rational trier of fact could have found Jones guilty of murder based on the evidence in this case. This issue is thus without merit.
II. Whether the verdict of the trial court was against the overwhelming weight of the evidence.
¶ 15. A motion for a new trial challenges the weight of the evidence. Hawthorne v. State, 835 So.2d 14, 21(¶ 31) (Miss.2003). “When reviewing a denial of a motion for new trial, this Court ‘will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.’ ” Vaughn, 926 So.2d at 271(¶ 4) (quoting Bush, 895 So.2d at 844(¶ 18)).
¶ 16. There was testimony by Austin that Jones intended to hurt his grandfather. Jones admitted to killing his grandfather, though he, the only witness to the actual crime, claimed self-defense. While there may have been conflicting testimony, we cannot say that the verdict was so contrary to the overwhelming weight of the evidence as to constitute an unconscionable injustice.
III. Whether the trial court erred in allowing into evidence graph exhibits 9, 31 and 32 over Jones’s objection as being cumulative and in violation of Rule 403 of the Mississippi Rules of Evidence.
¶ 17. Jones argues that three photographs entered into evidence, exhibits, 9, 31 and 32, violated Rule 403 of the Mississippi Rules of Evidence. Rule 403 states: “Although relevant, evidence may be excluded if the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence.” Jones argues that the photographs were cumulative, and that their probative value was outweighed by their potential for prejudice.
¶ 18. “It is well settled in this state that the admission of photographs is a matter left to the sound discretion of the trial judge and that his decision favoring admissibility will not be disturbed absent a clear abuse of that judicial discretion.” Noe v. State, 616 So.2d 298, 303 (Miss.1993) (citing Gardner v. State, 573 So.2d 716, 718-19 (Miss.1990); Sudduth v. State, 562 So.2d 67, 69-70 (Miss.1990)). The discretion of the trial judge in this matter is almost unlimited, “regardless of the gruesomeness, repetitiveness, and the extenuation of probative value.” Id. (quoting Williams v. State, 544 So.2d 782, 785 (Miss.1987)). So long as a photograph has probative value and serves a meaningful evidentiary purpose, it may still be admis *317 sible despite being gruesome, grisly or inflammatory. Id. The trial judge’s discretion, however, while “almost unlimited,” is not completely unfettered. Id. It has been noted by the Mississippi Supreme Court that photographs have been held “to be so gruesome and inflammatory as to be prejudicial in only one circumstance, close-up photograph of a partly decomposed, maggot-infested skull.” Taylor v. State, 672 So.2d 1246, 1270-71 (Miss.1996) (noting solitary instance of photographs being held prejudicial in McNeal v. State, 551 So.2d 151 (Miss.1989)).
¶ 19. “Photographs are considered to have evidentiary value in the following instances: ‘(1) aid in describing the circumstances of the killing; (2) describe the location of the body and the cause of death; (3) supplement or [clarify] witness testimony.’ ” McIntosh v. State, 917 So.2d 78, 83-84(¶ 13) (Miss.2005) (quoting Spann v. State, 771 So.2d 883, 895(¶ 31) (Miss.2000)).
¶ 20. In the case sub judice, photograph exhibit 9 displayed the body of the victim lying in a doorway, with bloodstains leading out of the door. Though there were other photographs of the body entered into evidence, none was precisely from the same angle or showed all the same details. Photograph exhibit 9 clearly described the location of the body, supplemented witness testimony as to its location, and displayed the wounds causing the victim’s death. Hence, the trial judge did not err in allowing it into evidence.
¶ 21. Photograph exhibits 31, 32 and 33 displayed closeups of the victim’s head. Photograph 31 displayed a frontal view of the victim’s face, photograph 32 displayed the victim’s head from the right side, and 33 displayed it from the left side. These photographs, though obviously disturbing, displayed lacerations and bruising on the different parts of the victim’s head. It would have been impossible to display all of the lacerations and bruising in a single photograph, and the photographs obviously aided in supplementing testimony as to the struggle between the victim and Jones, as well as bruising consistent with dragging the body after death. Thus, we do not find that these photographs were cumulative, or that their potential for prejudice outweighed their probative value. We hold that the trial judge did not abuse broad discretion by allowing photograph exhibits 9, 31 and 32 into evidence.
¶ 22. THE JUDGMENT OF THE CIRCUIT COURT OF LEE COUNTY OF CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO LEE COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., SOUTHWICK, IRVING, CHANDLER, GRIFFIS, BARNES AND ROBERTS, JJ. CONCUR.

. In fact, Ruffner and Lacastro actually began physically fighting.