MAXWELL, J.,
for the Court:
¶ 1. Brett Jones seeks post-conviction relief from his murder conviction and life sentence. On appeal, he alleges numerous *728 errors, primarily concerning his trial counsel’s effectiveness. Because Jones has failed to make the required two-part showing of (1) deficiency and (2) prejudice under Strickland on any of the issues raised, we affirm.
FACTS
I. BACKGROUND[1]
¶ 2. At the times pertinent to this case, Jones lived with his grandparents in Shannon, Mississippi. On August 9, 2004, Jones’s grandfather, Bertis Jones, discovered Jones’s girlfriend, Michelle Austin, in Jones’s bedroom. This angered Bertis, and he ordered Austin to leave his house, which she did. Austin later testified at trial that following this incident, Jones warned “he was going to hurt his granddaddy.”
¶ 3. Jones testified that later the same day he and his grandfather got into an argument in the kitchen. According to Jones, Bertis’s temper escalated, and he yelled at Jones and pushed him. When Jones pushed back, Bertis purportedly tried to hit him. After being cornered, Jones threw a steak knife — he claimed he already had in his hand from making a sandwich — which struck Bertis. Unfazed, Bertis attacked Jones, prompting Jones to stab Bertis. As the fight continued, Jones grabbed a different knife — a filet knife— and stabbed Bertis with it. Jones contends he was unable to escape.
¶ 4. After repeatedly stabbing his grandfather, Jones claimed he attempted to perform CPR but could not revive Bertis. Jones dragged Bertis’s dead body into the laundry room and shut the door. Jones then tried to wash the blood off of himself with a water hose. He also threw his blood-soaked shirt in the garbage. In an effort to conceal blood stains on the carport floor, Jones parked Bertis’s car over them.
¶ 5. A neighbor heard an old man “holler out he was in pain.” Two or three minutes later, the neighbor encountered Jones, who was covered in blood. The neighbor testified Jones was carrying a knife, trembling, and saying “Kill, kill.” The neighbor conveyed his encounter with Jones to his landlord. The landlord spotted Jones in the bushes near Jones’ grandparents’ house. When the landlord asked where Jones’s grandfather was, Jones claimed Bertis had left. The landlord pointed out that Ber-tis’s car was in the carport. Yet Jones still defended his false story that Bertis was not there. Jones also told the landlord the blood on him was fake and “a joke.” According to the landlord, Jones left with a young lady. The landlord inspected the bushes where he had seen Jones and found an oil pan containing blood.
¶ 6. Jones and Austin began walking together. Jones testified he and Austin planned to travel to Walmart to meet his grandmother to explain what had happened. But before they arrived, police apprehended the couple at a gas station. Both Jones and Austin gave false names to the arresting officers. During a pat down of Jones, an officer found a knife. The officer asked if it was the knife Jones “did it with.” Jones told him, “No, I already got rid of it.”
¶ 7. Investigator Scotty Reedy of the Lee County Sheriffs Department interviewed Jones. After voluntarily waiving his Miranda[2] rights and executing a writ *729 ten waiver, Jones provided an account similar to his later trial testimony.[3] He claimed he was making a sandwich in the kitchen with a knife in his hand, when he and his grandfather got into an argument. Thinking Bertis was about to hit him, Jones responded by stabbing Bertis in the chest. Upon Bertis’s alleged continued retaliation attempts, Jones stabbed Bei$is repeatedly. In his statement Jones also admitted telling Austin following the incident that he had “murdered” his grandfather.
¶ 8. An examination of Bertis’s body revealed he had been stabbed eight times. According to Dr. Stephen Hayne, who performed the autopsy, there were abrasions consistent with the body being dragged. There were also cuts on Bertis’s hand, which Dr. Hayne classified as “defensive posturing injuries.”
¶ 9. The jury found Jones guilty of murder. The circuit court sentenced him to life imprisonment. On direct appeal, Jones claimed his conviction was not supported by sufficient evidence or by the weight of the evidence. He also challenged the court’s admission of certain photographs. This court found no error and affirmed his conviction and life sentence. Jones v. State, 938 So.2d 312 (Miss.Ct.App.2006).
II. POST-CONVICTION FACTS
¶ 10. On July 30, 2008, the Mississippi Supreme Court granted Jones leave to seek post-conviction relief in the trial court. Jones filed his PCR motion on August 6, 2008. The circuit court later held a full evidentiary hearing. Jones’s father, Tony Jones, and grandmother, Madge Jones, both testified at the hearing, as did Jones’s two trial attorneys, William Bristow and Robert Laher. Bristow served as Jones’s appointed trial counsel, and Laher represented Jones pro bono. Jones’s uncle, Michael Jones, testified as the State’s sole witness.
¶ 11. The circuit judge denied Jones’s PCR motion. The judge observed that Jones made numerous vague and concluso-ry allegations of constitutional-rights violations. When pared down, he found the overarching issue was the alleged ineffectiveness of Jones’s trial counsel. Finding that Jones’s attorneys’ decisions were calculated and strategic, the circuit judge denied Jones’s PCR motion, holding that Jones had failed to satisfy the two-pronged test in Strickland, v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
III. JONES’S CLAIMS ON APPEAL
¶ 12. On appeal, the thrust of Jones’s allegations focus on his attorneys’ purported ineffective assistance. The numerous alleged deficiencies include: (1) not requesting a mistrial when two jurors received unredacted copies of Jones’s statement to police; (2) withdrawing a motion to suppress his statement to police; (3) not conducting a sufficient investigation; (4) failing to call two witnesses (Jones’s grandmother, Madge, and father, Tony); (5) failing to discover during voir dire that two jurors were related to the victim’s family; (6) stipulating to Dr. Hayne’s qualifications; (7) not presenting expert testimony rebutting Dr. Hayne’s testimony; (8) failing to object to the prosecutor’s statement during voir dire that “this is not a death penalty case”; (9) wrongfully advising Jones that his case would never go to trial. He also claims: (10) his appellate counsel was ineffective for not raising many of these same issues; (11) his sentence constitutes cruel and unusual punish *730 ment; and (12) the cumulative effect of multiple errors deprived him of a fair trial.
STANDARD OF REVIEW
¶ 13. In considering the denial of a PCR motion, we review the trial court’s findings of fact for clear error. Rowland v. State, 42 So.3d 503, 506 (¶ 8) (Miss.2010). “A finding of fact is ‘clearly erroneous’ when, although there is evidence to support it, the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been made.” Johns v. State, 926 So.2d 188, 194 (¶ 29) (Miss.2006). We accept as true any evidence, together with the reasonable inferences that may be drawn from that evidence, which supports the trial court’s findings. Loden v. State, 971 So.2d 548, 572 (¶59) (Miss.2007). As to credibility issues, we defer to the circuit judge who is the “sole authority for determining credibility of the witnesses.” Id. at 572-73 (¶ 59). When reviewing questions of law, our standard is de novo. Rowland, 42 So.3d at 506 (¶ 8). The PCR movant has the burden to show by a preponderance of the evidence that he is entitled to relief. Miss.Code Ann. § 99-39-23(7) (Supp.2010).
DISCUSSION
¶ 14. To prevail on a claim of ineffective assistance of counsel, Jones must establish: (1) his attorney’s performance was deficient,' and (2) the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To qualify as deficient, an attorney’s performance must fail to meet “an objective standard of reasonableness.” Id. at 688, 104 S.Ct. 2052. There is a “strong presumption that counsel’s conduct falls within the wide range of reasonable professional assistance; that is, ... the challenged action might be considered sound trial strategy.” Id. at 689, 104 S.Ct. 2052 (citation and quotations omitted).
¶ 15. Generally, “counsel’s choice of whether or not to file certain motions, call witnesses, ask certain questions, or make certain objections fall[s] within the ambit of trial strategy and cannot give rise to an ineffective assistance of counsel claim.” Jackson v. State, 815 So.2d 1196, 1200 (¶ 8) (Miss.2002) (citation and quotations omitted); see also Turner v. State, 953 So.2d 1063, 1073 (¶ 36) (Miss.2007). For prejudice to exist, there must be a “reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 694, 104 S.Ct. 2052.
¶ 16. The PCR movant has the burden to show both prongs of Strickland are met. Moody v. State, 644 So.2d 451, 456 (Miss.1994). His allegations under both prongs must be pled with specific detail. Jenkins v. State, 986 So.2d 1031, 1035 (¶ 14) (Miss.Ct.App.2008) (citing Brooks v. State, 573 So.2d 1350, 1354 (Miss.1990)). And the movant may not rely on mere allegations in his affidavit or brief. Vielee v. State, 653 So.2d 920, 922 (Miss.1995). We review whether the mov-ant has made the required showing under each prong of Strickland based on the totality of the circumstances. Carney v. State, 525 So.2d 776, 780 (Miss.1988).
¶ 17. Before proceeding, we note that Jones raises a litany of different claims. At times he clearly states the alleged errors, but his brief also contains a multitude of vague mentions of constitutional breaches. We point out that our rules of appellate procedure require that each issue be separately numbered in a statement of the issues. M.R.A.P. 28(a)(3). Failure to *731 present an allegation in this fashion bars our consideration of the issue. Reed v. State, 987 So.2d 1054, 1056-57 (¶¶ 6-8) (Miss.Ct.App.2008); see also M.R.A.P. 28(a)(6) (The argument section of brief “shall contain the contentions of appellant with respect to the issues presented.”). To the extent Jones has obscured certain allegations by not separately identifying them in his statement of the issues, we are under no duty to address such claims. Still we have attempted to respond specifically to each of Jones’s numerous allegations. We turn to his first.
I. FAILURE TO MOVE FOR MISTRIAL WHEN JURORS RECEIVED UNREDACTED COPIES OF JONES’S STATEMENT
¶ 18. Jones argues at least two jurors were exposed to inadmissible character evidence by receiving unredacted copies of Jones’s statement to police. Parts of Jones’s statement had been redacted by agreement between Jones and the State. It is undisputed that one redacted part related to a fight Jones had with his stepfather in Florida that resulted in a domestic-assault charge against Jones. Another redacted portion referred to Jones taking anger-management classes before moving to Mississippi.
¶ 19. During trial, Investigator Reedy, who had interviewed Jones, read from a transcript of an audio-recording of the interview. He did so without objection from defense counsel. The jury was provided transcripts of the recording to follow along. There were not enough copies of the redacted transcript, and at least one juror received an unredacted copy. This was brought to the court’s attention by a note from Juror 23. The note read:
I want you to know I was given a copy (it was ... made because we ran out) that contained the part that was supposed to be omitted. I did not ponder on this page, but turned immediately to the next page after realizing what happened [and] I did not refer back to that page again.
The circuit judge responded by questioning Juror 23 outside the presence of other jurors. Both the State and defense counsel were present. Juror 23 believed three extra copies had been made. She got one and thought one other juror might have received one like hers. She claimed she had not discussed the extra material with any other jurors. She further informed the judge she was unaware of what the extra material said. The following colloquy depicts this:
Juror 23: I did not read it. Just when I saw the first line, that it didn’t correspond to what [the officer on the stand] was reading, I flipped the page. The Court: Did you read it? Do you know what it says?
Juror 23: No, sir.
The Court: You skipped over to it.
Juror 23: Yes, sir.
The judge then instructed Juror 23 not to speak to anyone about these matters. The judge also questioned the other juror whom Juror 23 had indicated might have received an unredacted copy. But this juror maintained her copy was the proper version. She could not recall any discrepancies between her copy and the one the officer read.
¶ 20. Defense counsel were satisfied no prejudice had occurred. After the circuit judge had questioned both jurors, Laher stated on the record: “Based on the responses of the two jurors, the defendant is satisfied that nothing improper or accidentally was revealed, so we are satisfied.” At Jones’s PCR hearing, Laher further elaborated on his tactical decision not to make hay of this discrepancy. He ex *732 plained he thought moving for a mistrial was unwarranted in part because of the “curative efforts of the Court.”
¶ 21. We find these circumstances evince that Jones’s attorneys’ decision not to seek a mistrial was a sound strategic decision. It does not constitute deficient performance under Strickland. Jones offered no proof that any jurors learned of the allegedly inadmissible content. Laher’s determination at trial that “nothing improper or accidently was revealed” was objectively reasonable based on our review of the circuit judge’s colloquy with both jurors. We further point out that the properly redacted copy was entered into evidence and was the only version of Jones’s statement given to the jury during deliberations. Thus, Jones falls short of overcoming the strong presumption that his attorney acted competently.
¶22. Even assuming deficiency, Jones fails to show resulting prejudice. Uniform Rule of Circuit and County Court 3.12 authorizes a judge to grant a mistrial only when the harm done results “in substantial and irreparable prejudice to the movant’s case.” This standard was clearly not satisfied. All record evidence indicates neither of the two questioned jurors, nor any others, learned of the allegedly inadmissible extraneous portions of Jones’s statement.[4] So a request for a mistrial would have likely been futile. Accordingly, Jones cannot show prejudice from his attorneys’ conduct. Geiger v. Cain, 540 F.3d 303, 309-10 (5th Cir.2008) (to show Strickland prejudice, a criminal defendant must show the trial court would have granted the motion for mistrial, or would have committed reversible error in refusing it).
II. WITHDRAWAL OF MOTION TO SUPPRESS
¶ 23. Jones’s counsel initially moved to suppress Jones’s statement to police, but later opted to withdraw the motion. Jones contends withdrawing the motion amounts to ineffective assistance of counsel.
¶24. Both of Jones’s trial attorneys, Laher and Bristow, testified at the post-conviction evidentiary hearing. Concerning their decision not to pursue the motion to suppress, Laher explained:
[Jones’s statement] I felt, recalling back, fairly gave an account of his version of the events of that night. And as I read the statement, it was certainly not — it was a statement, is what it was. It was not the kind of statement that was just a, as a defense lawyer, you cringe at. It was certainly not something I was jumping up and down for either. It wasn’t a great statement, but it sort of gave an account of his version of the events. And I felt like in a worse case scenario it, if he did not testify at our portion of the case, it at least got his version out there for the jury to hear, which would not necessitate having him testify.
Jones ultimately testified at his trial. And Laher added that Jones’s trial testimony largely tracked the statement, maintaining that he had acted in self-defense. Likewise, Bristow determined the statement “contained what [they] thought to be exculpatory evidence.”
¶ 25. Based on these explanations, it appears Jones’s attorneys’ decision to withdraw the motion was a tactical one. However, we need not decide whether Jones’s attorneys performed deficiently *733 because Jones wholly fails to show prejudice. He argues a reasonable probability exists that he would have been found not guilty, had his statement been excluded. But he largely overlooks the question of admissibility. We focus primarily on this question because it is determinative of Jones’s inability to show prejudice.
¶ 26. The admissibility of a minor’s statement is determined based on the totality of the circumstances. Clemons v. State, 733 So.2d 266, 269 (¶ 10) (Miss.1999) (citing Fare v. Michael C., 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979)). There is a two-step inquiry that requires considering whether the accused: (1) was advised of his Miranda rights and (2) voluntarily waived those rights. In re W.R.A., 481 So.2d 280, 285-86 (Miss.1985). The Mississippi Supreme Court has explained the analysis for determining the admissibility of a minor’s statement is essentially the same as that for an adult’s statement, with age being one factor to consider in assessing voluntariness. Clemons, 733 So.2d at 270 (¶ 14); In re W.R.A., 481 So.2d at 285-86. The State must prove beyond a reasonable doubt the confession was voluntary. Moore v. State, 933 So.2d 910, 919 (¶ 30) (Miss.2006). This “burden is met and prima facie case made out by testimony of an officer, or other persons having knowledge of the facts, that the confession was voluntarily made without threats, coercion, or offer of reward.” Id.
¶ 27. Jones relies on the vague notion that his statement was involuntary because seasoned investigators took advantage of him. He claims his young age — he was then fifteen years old — and the absence of a parent during questioning render his statement involuntary. But these reasons alone have been found insufficient by our supreme court.
¶ 28. In Clemons, a fourteen-year-old defendant argued his statement was involuntary because a parent was not present during questioning. In affirming the minor’s murder conviction, the supreme court found “age ha[s] no special bearing on [a defendant’s] ability to be questioned without a parent and voluntarily waive his rights.” Clemons, 733 So.2d at 270 (¶ 14) (quoting Blue v. State, 674 So.2d 1184, 1205 (Miss.1996), overruled in part on other grounds by King v. State, 784 So.2d 884, 889-90 (¶¶ 19-25) (Miss.2001)).[5] Applying Clemons, it is clear Jones’s youth alone did not require he have a parent present during questioning to voluntarily waive his Miranda rights.
¶ 29. The following portion of Investigator Reedy’s trial testimony established a prima facie case of the voluntariness of Jones’s statement and Miranda waiver:
Q: Did you advise him of his rights against self incrimination; that is, what everybody knows as the [Miranda ] warnings?
A: Yes, I did.
Q: Did you use a form?
A: Yes.
Q: Do you have that form with you?
A: Yes, I do.
Q: Would you explain about that form, please?
A: This is our criminal investigation division, our [Miranda ] [r]ights *734 form. We read it to everybody that we talk to.
[[Image here]]
Q: And did you in fact read that [Miranda] warning to the Defendant?
A: Yes, I did.
Q: And did you ask him if he understood those rights?
A: Yes, I did.
Q: And what was his response?
A: Yeah. On one on part of it and on the waiver of rights, yes, sir.
Q: And what is the waiver of rights? What does that mean?
A: Basically it’s that he’s willing to make a statement and answer questions, and that’s exactly what it says on the waiver.
[[Image here]]
Q: After you advised the Defendant and he agreed to waive his rights, did you talk to him?
A: Yes, I did.
Q: And did he agree freely and voluntarily without any promise or any threat to give you a statement?
A: Yes.
In a post-trial affidavit attached to his PCR motion, Jones for the first time alleged: “I continually asked [the officers] to contact my mother because I did not know what to do.... They had me repeat my statement over and over, telling me to include and exclude certain details.” Jones did not claim coercion when he testified at trial.
¶ 80. In reviewing the circuit court’s denial of Jones’s motion, we examine the entire record. We must accept as true all evidence, together with any reasonable inferences, which supports the circuit court’s decision. Loden, 971 So.2d at 572 (¶ 59). Investigator Reedy’s trial testimony established that Jones voluntarily waived his Miranda rights. We also prominently note that despite having a full opportunity to challenge this evidence at the evidentiary hearing on his PCR motion, Jones chose to abandon his claims of police overreaching. Though Jones took the stand, he did not testify concerning the voluntariness of his statement to police. We further point out Jones’s bare allegations in his post-trial affidavit are legally insufficient to show ineffective assistance of counsel. See Vielee, 653 So.2d at 922. Therefore, we find he cannot meet his burden of proof. See Miss.Code Ann. § 99-39-23(7). See also Clark v. State, 35 So.3d 880, 888 (Fla.2010) (finding no merit to an ineffective-assistance claim where the PCR movant presented no evidence on that issue at the evidentiary hearing); Hunt v. State, 940 So.2d 1041, 1070 (Ala.Crim.App.2005) (same); People v. Pickens, 446 Mich. 298, 521 N.W.2d 797, 810 (1994) (same); Cauthem v. State, 145 S.W.3d 571, 616-17 (Tenn.Crim.App.2004) (same); cf. United States v. Walton, 188 F.3d 505 (4th Cir.1999) (unpublished decision finding ineffective-assistance claim waived where section 2255 petition was not supported at evidentiary hearing).
¶ 31. Jones also cannot show prejudice from his attorneys’ withdrawal of the suppression motion because he has not established his motion would have likely succeeded. Moore v. State, 301 Ga.App. 220, 687 S.E.2d 259, 266 (2009) (finding no prejudice under Strickland in an attorney’s failure to move to suppress where no showing that the motion would have succeeded); Rollison v. State, 346 S.C. 506, 552 S.E.2d 290, 292 (2001) (same); see also Geiger, 540 F.3d at 309-10 (same rule applied to moving for mistrial). We refuse to find an attorney ineffective for failing to proceed with a motion that has little or no chance of success. Jones’s failure to establish both prongs of Strickland is fatal *735 to his ineffective-assistance-of-counsel argument.
¶ 32. To the extent Jones challenges the voluntariness of his statement, we find that particular issue is procedurally barred since he did not raise it on direct appeal. Miss.Code Ann. § 99-39-21(1) (Rev.2007). See also Williams v. State, 669 So.2d 44, 52 (Miss.1996) (“Post-conviction relief is not granted upon facts and issues which could or should have been litigated at trial and on appeal.”). Though our supreme court has held that the procedural bars of the Uniform Post-Conviction Collateral Relief Act do not apply to “errors affecting fundamental constitutional rights,” Rowland, 42 So.3d at 507 (¶ 12), our precedent is equally clear that the mere assertion of a constitutional violation is not enough to clear the procedural hurdle. Means v. State, 43 So.3d 438, 442 (¶ 12) (Miss.2010). “There must at least appear to be some basis for the truth of the claim before the procedural bar will be waived.” Id. Further, a PCR movant may not rely solely on his own affidavit and unsupported allegations in his brief. Vielee, 653 So.2d at 922. Because Jones relies on bare assertions in his affidavit, and failed to put forth any evidence supporting his claim at the evidentiary hearing, we find his allegations concerning the voluntariness of his statement insufficient to survive the procedural bar.
III. FAILURE TO INVESTIGATE
¶ 33. Jones contends his attorneys did not adequately investigate his case because they did not spend enough time meeting with his grandmother, Madge, and his father, Tony.
¶ 34. Both Madge and Tony testified at the post-conviction evidentiary hearing. Tony admitted that Bristow had met. with him twice before the trial started. One meeting occurred at a coffee shop, and the second occurred “at the house.” Jones’s lawyers then asked Tony to come to the courthouse for the trial. There, they filled him in on the “preliminaries]” about “what’s going to happen[.]” However, the defense never called Tony as a witness.
¶ 35. Madge also met with Bristow at the coffee shop. She remembered the meeting being only about five minutes. She also remembered one of Jones’s attorneys visiting her house to observe the scene where the stabbing occurred. But she could not recall if the attorneys spoke with her at that time. She, like Tony, was sequestered at the courthouse during Jones’s trial, met with, his attorneys, but ultimately was not called.
¶ 36. Laher testified that he thought he remembered meeting with Tony and Madge “right before the trial started, or certainly before time to call them to testify.” He believed he or Bris-tow had met with them before then as well. Bristow remembered meeting with Madge and Tony after the 'first day of trial had adjourned. This court has held “[a] claim based on nothing more than an assertion that' the attorney spent insufficient time on the case is insufficient to show an entitlement to relief.” Pickett v. State, 861 So.2d 1049, 1051 (¶ 14) (Miss.Ct.App.2003)(citing Harveston v. State, 597 So.2d 641, 642 (Miss.1992)).[6] We find Jones’s general allegation that his counsel should have conducted lengthier witness interviews does not suffice to show their ineffectiveness.
¶ 37. The temporal aspect of their meetings aside, the record makes apparent that Jones’s attorneys determined the substance of Tony’s and Madge’s expected *736 testimony. Yet they chose not to call either witness for strategic reasons.[7] We find Jones has demonstrated neither deficient performance nor resulting prejudice on this issue.
IV. FAILURE TO CALL WITNESSES
¶ 38. Jones similarly argues his attorneys were incompetent for failing to call Tony and Madge as witnesses. He claims they would have offered important testimony regarding: (1) Bertis’s (the victim’s) propensity for violence; (2) Jones’s access to guns in the house (supporting the inference that he would have only used a knife in self-defense); and (3) the layout of the kitchen, where the stabbing occurred.
¶ 39. Madge testified at the post-conviction evidentiary hearing that Bertis had gone to the hospital twice for mental treatment. But according to her, the treatment occurred “[ajbout 40 years ago.” Madge also testified about the presence of five guns in her house. She claimed Jones had access to the guns and knew where to locate ammunition. She further testified that her kitchen contained a table and chairs at the time of the stabbing, although she did not explain the significance of this. On cross-examination, she admitted Bertis had never attacked Jones to her knowledge.
¶ 40. Tony testified at the evidentiary hearing that Bertis, in the year before his death, had developed a tendency to get emotional or angry at times. “We’d catch him crying in the living room for no reason. And the next time he’d just fly off the handle, you know, over something small.... It was getting a little bit more reactive, I guess.... Seemed like it was more than it needed to be.” Tony claimed he helped Bertis remodel his brother’s house. And if Tony performed any work that was not to Bertis’s liking, “He’d be hollering. Sometimes he would be cussing.” Tony agreed with Madge that there were five or six guns in the house during August 2004. He added that Jones knew how to use the guns. On cross-examination, Tony admitted he had been convicted of a felony, 3rd Offense DUI, though he did not identify the age of the conviction.
¶ 41. The State called Michael Jones. His . testimony sharply contradicted Madge’s and Tony’s on Bertis’s demeanor shortly before his death. Michael, who was Bertis’s son, testified that he was very close to Bertis. He would see him “three to four times a week, maybe even more.” He and Bertis frequently worked together. Michael claimed he never noticed any erratic behavior on Bertis’s part. He believed Bertis was “perfectly normal up until the day he died.” Michael claimed his son is about Jones’s age and .saw Bertis often. But Bertis never displayed any sort of violent behavior toward Michael’s son.
¶ 42. Both of Jones’s attorneys, Laher and Bristow, testified they had met with Madge and Tony and considered calling them at trial. But concerns arose over the perceived dangers associated with putting them on the stand.
¶ 43. Laher explained:
When we talked with [Tony and Madge], [Bristow] and I both, I think, came to the conclusion that while they would in some ways support our version of the events, our theory of the defense, the likelihood is that they would hurt that defense more on cross-examination just from a — whether it be a background or whether it be sort of a lack of specificity. I was not comfortable calling them, put it like that. I mean, if I had, I would have called them. Certainly would have *737 called them. But I was not comfortable calling them.
Laher also remembered the State had a rebuttal witness, which entered his decision not to call these witnesses.
¶ 44. Bristow testified he had discussed Bertis’s behavior with Madge. While he thought her testimony might be helpful in some ways, “there were other reasons why we did not call her.” She was “understandably ... an emotional wreck,” given that her grandson had just killed her husband. He explained that he and Laher “just felt like Madge was in a bad position. ... We just really did not really think she could be effective.” Of Tony, Bristow said “we ... really felt -like [he] was not going to be able to survive, I believe, the cross-examination of some seasoned veteran prosecutors.” Bristow added, “Really what [Tony and Madge] were able to offer, we were able to get from [Jones] himself.” And Bristow, like Laher, recalled that the State was prepared “to put on rebuttal testimony, I believe it was [Jones’s] uncle, to contradict what Tony and Madge were going to be able to say for us.”
¶ 45. Generally, an attorney’s decision whether to call certain witnesses is a matter of trial strategy. Jackson, 815 So.2d at 1200 (¶ 8); see also Turner, 953 So.2d at 1073 (¶ 36). Here, there was evidence before the trial judge that Jones’s attorneys’ decision not to call Madge and Tony was strategic. The records shows Jones’s attorneys considered: (1) the probative value of Madge’s and Tony’s testimony, (2) their emotional state, (3) their ability to withstand tough questions on cross-examination, and (4) the State’s rebuttal witness. After weighing the pros and cons of calling the victim’s wife and Jones’s father, the defense attorneys decided it was not in Jones’s interest to have them testify. Because this was a calculated, ' strategic decision, we find no error in the circuit court’s finding that Jones failed to establish his attorneys were deficient.
Y. VOIR DIRE OF THE JURY
¶46. Jones suggests his trial counsel was ineffective for not determining during voir dire that two jurors had a “friendship and/or work relationship” with Pat Jones — the victim’s daughter-in-law (also Jones’s aunt). Pat was allegedly married to Michael Jones, a potential rebuttal witness for the State. Michael did not testify at Jones’s trial. But he did testify at the post-conviction evidentiary hearing. The State supposedly planned to call Michael in rebuttal to Madge’s or Tony’s trial testimony had they testified — which they ultimately did not.[8]
¶ 47. Though Jones insists that the jury was tainted by juror relationships with Pat, he failed to present evidence at the PCR hearing ,to show that any juror knew Pat. A second evidentiary snag lies in Jones’s reliance on mere allegations in his brief, which are not supported in the record. Vielee, 653 So.2d at 922. For these reasons, Jones cannot meet his burden of proof. See Miss.Code Ann. § 99-39-23(7).
¶ 48. Procedural bars aside, even assuming the truth of . Jones’s factual allegations, Jones tells us nothing concrete to establish the • jurors’ bias or partiality. Under very similar facts, we found an attorney’s failure to move to strike a juror who had a working relationship or friendship with the victim’s family was not ineffective assistance of counsel. Scott v. State, 965 So.2d 758, 763-64 (¶¶ 26-30) (Miss.Ct.App.2007). Because the mere existence of such a relationship does not satisfy the Strickland standard, see id, Jones cannot meet his burden.
*738 VI.STIPULATION TO DR. HAYNE’S QUALIFICATIONS
¶ 49. Jones argues his trial attorneys were ineffective for stipulating to Dr. Hayne’s qualifications and declining to voir dire him concerning his qualifications.[9] We acknowledge Dr. Hayne’s work has received vast criticism as of late, indeed some of it earned. However, other than the rejection of his two shooter theory in Edmonds v. State, 955 So.2d 787 (Miss.2007), our supreme court has made abundantly clear that “Dr. Hayne is qualified to proffer expert opinions in forensic pathology [.]” Id. at 792 (¶ 8) (emphasis added). Furthermore, since Edmonds, the supreme court has consistently found Dr. Hayne qualified to render expert opinions in the field of forensic pathology in criminal cases. See Moffett v. State, 49 So.3d 1073, 1110-11 (¶¶ 126-27) (Miss.2010); DeHenre v. State, 43 So.3d 407, 417 (¶40) (Miss.2010); Nelson v. State, 10 So.3d 898, 904 (¶ 26) (Miss.2009); Lima v. State, 7 So.3d 903, 907 (¶ 17) (Miss.2009).
¶ 50. Jones urges us to create a blanket rule that an attorney is automatically ineffective for not challenging Dr. Hayne’s ability to testify as an expert witness, in light of Edmonds. Yet we evaluate ineffective-assistance-of-counsel claims from the attorney’s perspective at the time the decision at issue was made. This serves to eliminate “the distorting effects of hindsight.” Davis v. State, 897 So.2d 960, 965 (¶ 10) (Miss.2004). Jones’s trial predated the Edmonds decision by almost two years.
¶ 51. Here, Dr. Hayne testified about abrasions on the victim’s body consistent with it being dragged. He also deemed the cuts on the victim’s hand “defensive posturing injuries.” Jones makes no argument as to why this particular testimony is unreliable. Jones has shown neither deficient performance nor prejudice from his attorney’s stipulation to Dr. Hayne’s qualifications. Thus, we find his conclusory allegations fall short of Strickland’s dictates.
VII. NOT PRESENTING TESTIMONY CHALLENGING STATE’S EXPERT
¶ 52. Jones next claims deficient performance in his attorneys’ failure “to present any expert testimony to refute Dr. Hayne’s expert opinions.” But the mere fact that Dr. Hayne’s testimony was damaging to Jones’s case does not render his attorneys ineffective for not calling a rebuttal expert. Claims of ineffective assistance of counsel must be specifically pled on both prongs of Strickland. Jenkins, 986 So.2d at 1035 (¶ 14) (citing Brooks, 573 So.2d at 1354). Jones has not done so here. He has not explained why his attorneys’ failure to call a rebuttal expert was incompetent, other than offering speculative and conclusory allegations. Nor has he demonstrated the existence of contradictory expert testimony. That being so, he has also failed to show the substance of any contrasting testimony. Jones’s argument on this issue fails both prongs of Strickland.
VIII. FAILURE TO OBJECT DURING VOIR DIRE TO PROSECUTOR’S COMMENT ON SENTENCING
¶ 53. During voir dire at Jones’s trial, the prosecutor mentioned to the jury panel “this is not a death penalty case.” Jones’s attorney did not object, which Jones contends amounted to ineffective assistance of counsel. Jones cites no supporting author *739 ity for this position, which is itself a procedural bar to our review of the issue. Dampier v. State, 973 So.2d 221, 228-29 (¶ 20) (Miss.2008). This waiver aside, Jones still fails to meet Strickland ⅛ two-part test.
¶ 54. Whether to object is generally a matter of trial strategy. Jackson, 815 So.2d at 1200 (¶ 8); see also Turner, 953 So.2d at 1073 (¶ 36). Though we are not convinced that Jones’s attorneys’ failure to object to the prosecutor’s comment on sentencing constitutes deficient performance — especially given the strong presumption that counsel acted competently— we need not decide that question. Because Strickland’s second prejudice-based prong is clearly not met, we focus there.
¶ 55. Just how an objection to the prosecutor’s comment would have altered the outcome has not been addressed. More importantly, the circuit judge instructed the jury that it was their “duty to determine the facts and to determine them from the evidence produced in open court.” They were to then apply the law to the facts in deciding the case. The judge clearly instructed that “statements and remarks of counsel ... are not evidence.” And that “[a]ny argument, statement or remark having no basis in the evidence should be disregarded by you.”
¶ 56. We presume jurors follow the instructions given by the court. See, e.g., Clark v. State, 40 So.3d 531, 539 (¶ 16) (Miss.2010). Any arguable mistake by Jones’s counsel in failing to object was cured by the court’s instruction. Once more, Jones has not met his burden of showing Strickland prejudice.
IX. ADVISING JONES THAT HIS CASE WOULD NOT GO TO TRIAL
¶ 57. Jones also contends his attorneys told him his case would not go to trial. Jones did not testify at the eviden-tiary hearing that this statement was even made, nor did his affidavit contain this allegation. One of his attorneys, Laher, denied that he made such a statement to Jones and did not remember Bristow doing so. Because Jones may not rely on bare allegations in his brief, Vielee, 653 So.2d at 922, we find no merit to this issue.
X. APPELLATE COUNSEL
. ¶ 58. Jones contends his appellate counsel [10] was ineffective for not raising certain issues on direct appeal, resulting in those issues being procedurally barred. See Williams, 669 So.2d at 52. Jones claims, among other things, that his attorney was ineffective for failing to appeal: (1) two jurors’ alleged exposure to extraneous material, (2) the voluntariness of his statement, and (3) the prosecutor’s comment during the voir dire that “this is not a death penalty case.” We have discussed the specifics of these allegations, which we will not rehash.[11] It suffices to say Jones has not shown the prejudice prong of Strickland is satisfied. See Conway v. State, 48 So.3d 588, 603 (¶ 26) (Miss.Ct.App.2010) (Strickland standard applies to claims of ineffective appellate counsel); see also Teague v. Scott, 60 F.3d 1167, 1173-74 (5th Cir.1995) (same).[12]
. ¶ 59. Jones’s appellate attorney challenged the sufficiency and weight of the *740 evidence. He also raised an evidentiary issue concerning the admission of certain photographs. This court found no error and affirmed Jones’s conviction. Jones, 938 So.2d at 313 (¶ 1). Jones fails to show had his appellate attorney raised these other issues he now identifies, his conviction would have been reversed. Jones cannot meet Strickland’s prejudice prong and fails to carry his burden on this issue.
XL EIGHTH AMENDMENT
¶ 60. Jones argues because he was fifteen years old at the time of the stabbing, his life sentence for murder violates the Eighth Amendment’s prohibition against cruel and unusual punishment. See U.S. Const, amend. VIII; see also Miss. Const, art. 3, § 28 (containing similar provision). He also argues the circuit judge should have conducted a proportionality review. This issue would normally be procedurally barred for failure to raise the issue on direct appeal. Miss.Code Ann. § 99-39-21(1);[13] Williams, 669 So.2d at 52. But the Mississippi Supreme Court has held that the procedural bars of the UPCCRA do not apply to “errors affecting fundamental constitutional rights,” Rowland, 42 So.3d at 507 (¶ 12), which certainly include the right to be free from cruel and unusual punishment.
¶ 61. An appellate court generally will not disturb a sentence where it does not exceed the statutory maximum. Long v. State, 52 So.3d 1188, 1197 (¶31) (Miss.2011) (citing Cummings v. State, 29 So.3d 859, 861 (¶ 4) (Miss.Ct.App.2010)). But “if a sentence is grossly disproportionate to the crime committed, it may be reviewed on Eighth Amendment grounds.” Trotter v. State, 9 So.3d 402, 412 (¶ 26) (Miss.Ct.App.2008) (citing Ford v. State, 975 So.2d 859, 869 (¶ 39) (Miss.2008)).
¶ 62. The United States Supreme Court has recognized two different types of proportionality challenges. “The first involves challenges to the length of term-of-years sentences given all the circumstances in a particular case. The second comprises cases in which the Court implements the proportionality standard by certain categorical restrictions on the death penalty.” Graham v. Florida, 560 U.S. 48, -, 130 S.Ct. 2011, 2021, 176 L.Ed.2d 825 (2010). In Graham, the Supreme Court for the first time adopted a categorical restriction in a non-death-penalty context,[14] holding the Eighth Amendment prohibits life imprisonment without parole as punishment for juveniles who commit non-homicide crimes. Id. at 2030.
¶ 63. Jones was sentenced under Mississippi Code Annotated section 97-3-21 (Rev.2006). This statute mandates that “[e]very person who shall be convicted of murder shall be sentenced by the court to imprisonment for life in the State Penitentiary.” Id. The statute affords the sentencing judge no discretion. To the extent Jones challenges the constitutionality of section 97-3-21 as applied categorically to juveniles, we have specifically rejected his argument. See Evans v. State, 109 So.3d 1056 (¶¶ 42-43) (Miss.Ct.App.2011) (rehearing pending). In Evans, we noted the United States Supreme Court’s recent ban on sentencing juveniles who commit non-homicide crimes to life imprisonment without parole. Id. (citing Graham v. Florida, 560 U.S. 48, 130 S.Ct. 2011, 176 L.Ed.2d *741 825 (2010)). But we declined to extend the Supreme Court’s holding in Graham to juveniles who commit murder. Id. Several other jurisdictions have also taken this approach. See, e.g., Jackson v. Norris, 2011 Ark. 49, 2011 WL 478600 (2011); Miller v. State, 68 So.3d 676, 685-691 (Ala.Crim.App.2010); Gonzalez v. State, 50 So.3d 633, 635 (Fla.Dist.Ct.App.2010). Because Jones was sentenced to life imprisonment for committing murder — as opposed to a nonhomicide crime — Graham is inapplicable.
¶ 64. To the extent Jones contends the trial court should have on its own initiative engaged in a proportionality analysis, comparing the gravity of the crime to the severity of the sentence, we note that the Mississippi Supreme Court has declined to adopt, as Jones now urges, a mandatory requirement that trial courts conduct a proportionality analysis. Horne v. State, 825 So.2d 627, 641 (¶ 58) (Miss.2002) (finding fourteen-year-old offender’s proportionality argument procedurally barred for failure to request a proportionality review). Further, the supreme court has found trying a juvenile as an adult offender in murder cases, with the circuit court having original jurisdiction, does not constitute cruel and unusual punishment. Blue, 674 So.2d at 1230, overruled on other grounds by King, 784 So.2d at 889-90 (¶¶ 19-25); Foster v. State, 639 So.2d 1263, 1295-96 (Miss.1994).[15] And this court has rejected the notion that a life sentence is grossly disproportionate to the. crime of murder, even when committed by a juvenile. Evans, 109 So.3d at 1067 -1069 (¶¶ 39-41).
¶ 651 In considering whether a sentence is grossly disproportionate, courts should “begin by comparing the gravity of the offense and the severity of the sentence.” Graham, 130 S.Ct. at 2022. “In [a] rare case in which this threshold comparison leads to an inference of gross disproportionality the court should then compare the defendant’s sentence with the sentences received by other offenders in the same jurisdiction and with the sentences'imposed for the same crime in other jurisdictions.” Id. (internal quotations omitted). In its 2005 decision in Roper, the United States Supreme Court imposed a categorical prohibition on the death penalty as punishment for juvenile offenders. Roper v. Simmons, 543 U.S. 551, 578-79, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005). Yet the Court affirmed the juvenile defendant’s life sentence. Id. at 560. The Roper Court did not hold that any inference of gross disproportionality is raised by imposing a life sentence on a juvenile offender who commits murder, and no other Supreme Court decision has so held. We decline to adopt such a rule. We finally note the United States Supreme Court’s observation that the crime of felony murder — with no specific intent to kill — is a crime for which “clearly no sentence of imprisonment would be disproportionate[.]” Solem v. Helm, 463 U.S. 277, 290 n. 15, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). Here, the jury found Jones guilty of murder with deliberate design and specific intent to kill.
¶ 66. For these reasons, we find no Eighth Amendment violation in Jones’s sentence.
*742 XII. CUMULATIVE ERROR
¶ 67. The cumulative-error doctrine provides “that individual errors, not reversible in themselves, may combine with other errors to make up reversible error.” Wilburn v. State, 608 So.2d 702, 705 (Miss.1992). Since we find no error in the circuit judge’s findings, there can be no cumulative error.
¶ 68. THE JUDGMENT OF THE LEE COUNTY CIRCUIT COURT DENYING THE MOTION FOR POST-CONVICTION RELIEF IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., MYERS, BARNES, ISHEE, ROBERTS, CARLTON AND RUSSELL, JJ., CONCUR.

. A more extensive recitation of the facts from Jones’s trial can be found in this court’s decision affirming Jones’s conviction on direct appeal. See Jones v. State, 938 So.2d 312 (Miss.Ct.App.2006).

. Miranda v. Arizona, 396 U.S. 868, 90 S.Ct. 140, 24 L.Ed.2d 122 (1969).

. Though Jones’s statement is not a part of our official record, Jones has quoted parts of his statement in both his trial and appellate briefs.

. Mississippi Rule of Evidence 404 generally excludes from evidence a person's character traits or his prior acts because of the danger that the jury would use such considerations to convict the accused. Rule 404 cmt. To decide this issue, we need not analyze whether the redacted portions of Jones’s statement were admissible under Rule 404.

. According to the supreme court, this rule applies "where [the] crime is such that circuit court has original jurisdiction^]” Clemons, 733 So.2d at 270 (¶ 14). Here the circuit court had original jurisdiction. See Miss. Code Ann. § 43-21-151(l)(a) (Rev.2009) (circuit court has original jurisdiction in cases involving "[a]ny act attempted or committed by a child, which if committed by an adult would be punishable under state or federal law by life imprisonment or death.”)

. While Pickett involved post-conviction relief from a guilty plea, we find this rule equally applicable to a petitioner who proceeded to trial.

. See Issue IV.

. See Issue IV.

. Jones's attorney questioned Dr. Hayne concerning certain autopsy photographs, but stipulated Dr. Hayne was qualified to testify as an expert in forensic pathology.

. We note that Bristow, one of Jones's trial attorneys, served as appellate counsel.

. See Issues I, II, and VIII.

.We note that our supreme court has established a procedure for appellate counsel rep-presenting an indigent criminal defendant to follow when the attorney, finds there are no meritorious issues to be appealed. Lindsey v. State, 939 So.2d 743 (Miss.2005).

. Section 99 — 39—21(1) provides: "Failure by a prisoner to raise ... issues or errors ... capable of determination ... on direct appeal, regardless of whether such are based on the laws and the Constitution of the state of Mississippi or of the United States, shall constitute a waiver thereof and shall be procedurally barred[J”

. Graham, 130 S.Ct. at 2046 (Thomas, J., dissenting).

. We acknowledge Blue and Foster have been limited by the United States Supreme Court's holding in Roper v. Simmons, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) because Blue and Foster upheld the constitutionality of death sentences for juvenile offenders, which Roper categorically prohibits. But we find Blue and Foster remain intact insofar as holding the Eighth Amendment does not forbid juveniles who commit murder from being tried as adults in circuit court.