# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-KA-00053-COA

DANNY WILSON A/K/A DANNY MARTEZ
WILSON

APPELLANT

v.

STATE OF MISSISSIPPI

APPELLEE

DATE OF JUDGMENT: 09/16/2015
TRIAL JUDGE: HON. LAMAR PICKARD
COURT FROM WHICH APPEALED: CLAIBORNE COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT: CYNTHIA ANN STEWART
ATTORNEY FOR APPELLEE: OFFICE OF THE ATTORNEY GENERAL
BY: KATY TAYLOR GERBER
DISTRICT ATTORNEY: ALEXANDER C. MARTIN
NATURE OF THE CASE: CRIMINAL - FELONY
DISPOSITION: AFFIRMED - 03/13/2018
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### BEFORE GRIFFIS, P.J., BARNES AND FAIR, JJ.

### BARNES, J., FOR THE COURT:

¶1.     Danny Wilson was convicted of first-degree murder and sentenced to life in the custody of the Mississippi Department of Corrections (MDOC). He filed a motion for a new trial, claiming newly discovered evidence shows he acted in self-defense. Following the trial court's denial of his motion, Wilson appeals. Finding no error, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶2.     On December 27, 2014, Wilson shot and murdered Roviel Mays in Port Gibson, Mississippi. He was indicted for first-degree murder, and a jury trial was held on September 15, 2015, in Claiborne County Circuit Court. At trial, three eyewitnesses testified to similar

versions of what occurred that evening. Clyde Johnson said that he, Mays, and Jeremy Bailey had gone to West Side Theater, a nightclub, and stayed there until approximately 2:00 a.m. The three men, along with Jakarla Young and another female, got into Johnson's car and proceeded to the home of Marquis and Natasha Shaw. Wilson, driving a white car, came up behind Johnson's car and passed him at a light. When Johnson and the others arrived at the Shaws' home, Wilson was there, sitting in his car. According to Johnson, Mays got out, walked toward the home, but "all of a sudden, he turned around and looked like h[e] and Danny Wilson [were] talking, and . . . the interior light [of the car] came on, and then Danny shot. When he shot, he left." After Mays was shot, Marquis "shot toward Danny's car a couple of times." On cross-examination, defense counsel asked Johnson if Mays was carrying a gun. He replied: "I know for sure he didn't have no gun in my car. . . . I didn't search him, but I know he didn't have no gun. . . . Didn't nobody have no gun."

¶3.   Young testified she accepted a ride from Johnson to the Shaws' home that evening, and she observed that Wilson "popped up at a light" next to them and that he passed them. When she and the others reached the home, Wilson was there. After Mays walked over to Wilson's car, Young heard a shot and saw Mays fall to the ground. She also corroborated Johnson's testimony that Marquis came out of the house at that point and began shooting at Wilson's car.

¶4.   Natasha Shaw testified that she was home that evening at approximately 2:45 a.m. when she heard a "loud noise." When she went outside to investigate, she saw Wilson pull

2

up in a white car. Shortly thereafter, Johnson "pulled up," and Mays got out of Johnson's car and started walking toward the house. But after Mays got to her driveway, he stopped and walked over to Wilson's car. Mays "leaned into the car"; so Natasha thought the two men were just talking. Then she heard the gunshot and saw Mays fall "back on the ground."

¶5.    The forensic pathologist testified that Mays died from a gunshot wound to his head, specifically his right eye, and the range of the shot was from "around three inches out to three feet." A firearms expert with the Mississippi Forensic Science Laboratory stated that the projectile retrieved from Mays's body "b[ore] different characteristics than any of the others that [she] was able to classify" and that "it could not have been fired from the same gun" as the other projectiles that were found.

¶6.    After the State rested, the defense moved for a directed verdict, which the trial judge denied. Defense counsel then called two witnesses who were at the West Side Theater that evening. Kordell Bates said he saw Johnson, Mays, and Bailey at the club with guns. On cross, he acknowledged that the three men had been "talking trash" to Wilson that night. When questioned whether Mays had committed any prior violence against Wilson, another witness, Lee Hedrick, responded affirmatively: "Yes, ma'am . . . he came to Pattison several times shooting up . . . I done seen him do it myself plenty of times. [Wilson is] the one that talk[ed] about leav[ing] it alone[.]" He also claimed the other men were carrying weapons at the nightclub, but he admitted that he never saw Wilson at the West Side Theater that night. He also said that he was not at the Shaws' home and was not a witness to the shooting.

3

¶7.    Wilson was convicted of first-degree murder and sentenced to life in the custody of the MDOC.  In his motion for a new trial, Wilson asserted numerous assignments of error, including that there was new evidence in the case.  He attached an affidavit from Young that stated Mays had a gun in his pants when he walked up to Wilson, and Mays hit Wilson "on the side of his head."  A hearing was held on November 24, 2015.  Young testified that after the trial, she approached defense counsel to say that she had not given a complete account of what had happened at the shooting.  She claimed that when Mays approached Wilson's car, "he had his hands in his pants as if he had a gun."  She said: "You just know how young boys[,] when they're ready to pull out and shoot, so he walked to the car and he hit [Wilson], and that's when the . . . gunshot was fired from Danny Wilson's car."  She averred that Mays used the gun to hit Wilson.  Wilson's grandmother, Theresa Wilson, testified that Mays had threatened Wilson's life on several occasions prior to the shooting.  The defense proffered an affidavit from Wilson's girlfriend, which simply stated the two were in a relationship, and a statement by Jason Curtis that said he had seen Mays carrying a weapon "at all times that he had run into him."

¶8.    The trial court denied Wilson's motion, and he now appeals.

**DISCUSSION**

¶9.    Wilson argues that the trial court should have granted him a new trial based on the newly discovered evidence, specifically Young's testimony that Mays was carrying a

4

weapon, and this evidence established a basis to show that he shot Mays in self-defense.[1]  A

trial court's decision to grant or deny a new trial based on newly discovered evidence is

discretionary, "and we will not reverse a trial court's finding unless [it] abused that

discretion." *Witherspoon v. State*, 767 So. 2d 1065, 1067 (¶7) (Miss. Ct. App. 2000) (citing

*Williams v. State*, 669 So. 2d 44, 55 (Miss. 1996)).  A movant seeking a new trial based on

newly discovered evidence must show:

> (1) the new evidence was discovered after the trial; (2) it could not by due
> diligence have been discovered prior to trial; (3) it is material to the issue and
> not merely cumulative or impeaching; and (4) the new evidence will probably
> produce a different result or verdict in the new trial.

*Van Norman v. State*, 114 So. 3d 799, 801 (¶11) (Miss. Ct. App. 2013).  "Relief must be

denied if the movant fails to meet any one of these four elements."  *Id*.

¶10.    We find that the evidence presented at the hearing was either known prior to trial,

"reasonably discoverable" at the time of trial, or "merely cumulative."  Regarding the

testimony of Wilson's grandmother–that Mays had threatened Wilson on prior occasions–

defense counsel stipulated at the hearing that she "was aware of all this prior to the trial" and

"it was [counsel's] decision not to call her" as a witness.  Counsel explained that she elected

---

[1] While there is also discussion in Wilson's reply brief about the admissibility of a
victim's propensity for violence, nothing in the record indicates this was ever an issue at
trial.  In fact, the court allowed the defense to present testimony as to Mays's prior acts of
violence through Hedrick's testimony.  And the testimony by Wilson's grandmother at the
posttrial hearing regarding past incidents involving Mays and Wilson was not challenged
by the State.  As Wilson has not made any claim of error on this issue, and seems to include
it merely to support his claim of self-defense, we consider it only in that context.

not to present such evidence at trial because she was worried it would "strengthened the State's motive for my client having shot Mr. Mays." As to the affidavits/statements by the other two witnesses, Curtis and Robinson, those were "merely cumulative" of evidence presented at trial and would not have changed the result.

¶11.  We further find Young's testimony that Mays possessed a gun, by due diligence, could have been discovered prior to trial. Young argued at the hearing that the State did not ask her the right question at trial to elicit her testimony that Mays had a gun.

> [STATE]:  And I gave you a chance to tell what happened, didn't I?
>
> [YOUNG]:  Yes, sir.
>
> [STATE]:  And you didn't mention what you're saying today, did you?
>
> [YOUNG]:  I did, but it was in a different phrase, so basically, yeah, I did, but what I'm telling you now is how the story happened from the beginning. . . . You didn't ask the question that [defense] just asked me. The extra question she just asked me what happened on the scene with Mays. You didn't ask me that. That's the first time that's been asked.
>
> . . . .
>
> [STATE]:  So I asked you about what happened on the scene and you didn't – you had every opportunity to tell me that prior to trial, didn't you?
>
> [YOUNG]:  Right, but like she got more into detail than you.

However, the trial transcript shows that during its case-in-chief at trial, the State openly inquired of Young: "When [Mays] got to Danny's car, what happened?" Young simply replied: "Gunshots went off." Young was free to respond to the State's questioning with her

6

complete version of the shooting and to convey any details she wished to the jury. Yet, she made no mention of Mays's possessing a gun or hitting Wilson with a gun. There was no testimony by any witness at trial that Mays was carrying a gun when he went to talk to Wilson at his car; defense witnesses only stated that they saw Mays with a gun earlier at the club. We also note that defense counsel acknowledged she "did not talk to [Young] prior to trial." As the State argues: "Had defense counsel exercised due diligence and questioned Young prior to trial, this evidence would have been discovered." Therefore, we find no merit to Wilson's contention that Young's testimony could not have been obtained earlier. Furthermore, although Wilson argues that Young "testified falsely at trial," [t]he fact that a witness changes [her] testimony after the trial is not alone an adequate ground for granting a new trial." *Woods v. State*, 141 So. 3d 14, 16 (¶10) (Miss. Ct. App. 2014) (quoting *Russell v. State,* 849 So. 2d 95, 107 (¶15) (Miss. 2003)).

¶12. Additionally, we conclude that Young's failure to provide this testimony at trial did not prevent Wilson from presenting a theory of self-defense. Defense counsel argued at trial that Wilson was ambushed, gunshots were fired from several directions, and who actually shot Mays was unclear. Wilson presented witnesses who said Mays had possessed a gun earlier that evening. A self-defense jury instruction also was given.

¶13. Accordingly, we find the trial court did not abuse its discretion in denying Wilson's motion for a new trial, and we affirm the court's judgment.

¶14. **AFFIRMED.**

7

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., CARLTON, FAIR, WILSON, GREENLEE AND WESTBROOKS, JJ., CONCUR. TINDELL, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**